Linda LaROSE, Plaintiff,

v.

PHILADELPHIA NEWSPAPERS, INC., Joel Schrager, and Knight–Ridder Inc., Defendants.

No. CIV. A. 97–2992.

United States District Court, E.D. Pennsylvania.

Sept. 9, 1998.

Malcolm W. Berkowitz, Philadelphia, PA, for Plaintiff.

Linda LaRose, Levittown, PA, pro se.

Linda S. Dwoskin, Michele Langer, Philadelphia, PA, for Defendant.

## MEMORANDUM

LOWELL A. REED, Jr., District Judge.

In her second amended complaint, plaintiff Linda LaRose ("LaRose") alleges claims for hostile environment sexual harassment under Title VII, 42 U.S.C. § 2000e–5 and under the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. Ann. § 951 *et seq.,* and a claim for intentional infliction of emotional distress. Presently before the Court are the motions of defendants Philadelphia Newspapers, Inc. ("PNI"), Knight–Ridder Inc. ("Knight–Ridder"),[1] and Joel Schrager ("Schrager")[2] for summary judgment on all of LaRose's claims. LaRose continued to by employed by PNI at the time these motions were filed. For the reasons that follow, the motions will be granted.

**1.** Count IV of the second amended complaint, alleging a claim for intentional infliction of emotional distress against Knight–Ridder, was stricken by an Order of this Court dated November 12, 1997 (Document No. 27).

**2.** The claim of LaRose against Schrager under Title VII was dismissed by Order of this Court dated March 25, 1998 (Document No. 39).

## I. BACKGROUND

The following facts are gleaned from the record and taken in the light most favorable to LaRose, the nonmoving party. Immaterial facts and factual averments not properly supported by the record are omitted. The bases for many of LaRose's claims come from her own testimony at her deposition. Because the timing of the events forming the basis of LaRose's allegations is of the essence in determining this motion, the facts are organized accordingly.

### A. *Events Occurring Before June 15, 1994*

LaRose began working for PNI on December 27, 1982 as a masker/copy runner in the Ad–Art department. Schrager was one of her lay-out supervisors.[3] All of the employees in the Ad–Art department, including LaRose and Schrager, reported to the manager of the department.

At some point shortly after she was hired by PNI, LaRose testified that Patrick McKernan, her production supervisor, asked her to go out for a drink. (LaRose dep. at 45). She testified that McKernan and Lisa Frye, another female employee, went for drinks on four or five occasions in the mid–1980s. (LaRose dep. at 57–59). In 1983 Schrager stood too close to her when he gave practice layouts to her, with his "thigh up the side of her leg and body to body." (Pl.'s Mem. at 4; LaRose dep. at 78). In 1983 Schrager stood too close to her in a projector machine and said in a seductive voice that he was not just going to teach her about layout, he was "going to teach [her] about life." (LaRose dep. at 80–82). In the fall of 1983, LaRose complained to the union shop steward and Walter Costello ("Costello"), the manager of the Ad–Art department at the time, about this advance by Schrager (LaRose dep. at 103–107). The problems with

**3.** Schrager argues in his motion for summary judgment that he is not liable to LaRose for sex discrimination because he was not a supervisor to LaRose. Because I will grant summary judgment in his favor on other grounds, I assume without deciding that Schrager was in a supervisory relationship with LaRose.

Schrager standing too close to her were most intense from 1983 through 1986, but that they continued though 1996. (LaRose dep. at 882).

On June 1, 1983, shortly after LaRose turned twenty-one years old, Schrager told LaRose that if he knew it was her birthday, he would have taken her out for a drink. (LaRose dep. at 100). At some point in 1983, Schrager told her a dirty joke on the job. (LaRose dep. 169–172).

The most severe allegations made by La-Rose occurred in the summer of 1983. La-Rose claims that Schrager came up behind her while she was standing in the office and working on a practice layout, groped her breasts, and made grinding, "humping" motions behind her. (LaRose dep. at 126–133). In the week following this event, Costello approached LaRose to ask what was going on between her and Schrager because Schrager wanted her to be fired. (LaRose dep. at 145). Costello told LaRose that Schrager did not want him to promote La-Rose. (LaRose dep. at 175). LaRose talked to Costello and the union shop steward about the groping incident and other incidents with Schrager. (LaRose dep. at 147–49). Directly after this meeting with Costello, Schrager called LaRose a "lying bitch" and had to be restrained by others when LaRose was near him. (LaRose dep. at 176–78).

At some time just prior to the groping incident, Schrager told LaRose that "she had a really nice spread" while standing behind her. (LaRose dep. at 151–152). LaRose informed her union representative about this event, and the advice she received was not to file a grievance until she had been promoted so that she would be in a better position to complain. (LaRose dep. at 158–59). In 1984, LaRose filed a grievance with the union about these events. (LaRose dep. at 160).

LaRose alleges that sometime in the mid–1980s Schrager placed on her desk a sexually explicit writing framed like a coupon and "referring to tightly packed eclairs filled to overflowing with thick, hot, juicy, sweet delicious cream oozing down the sides." (Pl.'s Mem. at 13; LaRose dep. at 842–43). Schrager told LaRose that she could cash in the coupon later. (LaRose dep. at 843). She showed the coupon to Costello and to her union shop steward. (LaRose dep. at 847–48).

Despite the problems she had with Schrager, at some point in 1984, LaRose was promoted to apprentice artist. (LaRose dep. at 189, 334).

LaRose claims that Schrager made changes to her work and intentionally left misspellings in her work, while he did not do this to the work of other employees work until after 1989. According to her testimony, this tampering occurred more than five times, the last occurring in the mid–1990s. (Pl.'s Mem. at 11; LaRose dep. at 565–571).

In the mid–1980s, Schrager began following LaRose to the bathroom, the lunch room, and other places in the office. (LaRose dep. 197–198, 201–205). Between 1987 and 1988, Schrager followed her to aerobics class two times a week and also followed her to a talent show meeting in the office. (LaRose dep. at 276–87, 288–90). At some time between 1987 and 1989, Schrager followed her and other female employees to a scenery meeting in the office. Several times Schrager accused her of walking to a distant bathroom so that she could pick up men at work. (LaRose dep. at 198, 206–07).

Another female employee in the department, Carol Estonnell, complained to LaRose in the mid–1980s that Schrager had asked her out, that he watched and seemed angry at her for turning him down, and that she was denied overtime. (LaRose dep. at 728–33). LaRose alleges that Estonnell confirmed this in her deposition testimony, but makes no citation thereto.

LaRose stated that Michelle Pressley Jones also complained to her about Schrager in the mid–1980s. Jones felt that Schrager criticized her work and called her into his office because he was interested in her. (LaRose dep. at 736–38).

In 1986, Schrager changed LaRose's shift to 12:00 P.M. to 8:00 P.M., under the pretext that she was being switched to receive more training on her lettering skills. (LaRose dep. at 345). LaRose felt constantly threat-

ened that she would be fired. (LaRose dep. 341–42).

By March of 1986, LaRose consulted counsel regarding her work situation. LaRose's attorney sent a letter to PNI dated March 7, 1986 in which he stated that it was his view "that Ms. LaRose has a clear basis for filing a charge of discrimination with the United States Equal Employment Opportunity Commission." LaRose received a copy of the letter from her attorney. (PNI Ex. D). In 1986, LaRose visited the Pennsylvania Human Relations Commission ("PHRC") because she felt she had a claim, but she did not file a complaint. (LaRose dep. at 356).

In July of 1987, LaRose saw Schrager drive by her home after returning from the hospital as if to check up on her. (LaRose dep. at 219–226).

In April of 1990, LaRose met with Schrager and Chris Bonaducci, the human resources director at PNI, to discuss her complaints against Schrager. LaRose was told that the friction was just a "personality clash." (LaRose dep. at 675).

In 1990, LaRose went to the PHRC and filled out a complaint for sexual harassment but the complaint was never filed. (PNI Ex. H).

LaRose stated that she and other female employees were denied the use of computers from 1987 until March of 1991. (LaRose dep. at 382–84). LaRose concedes that she had access to a computer in early 1991 and received training from Michelle Pressley in 1993. (LaRose dep. at 400).

### B. *Events Occurring On or After June 15, 1994*

LaRose testified that Schrager frequently followed her to the lunchroom and the preprint department until she went on sick leave in April of 1996. (LaRose dep. at 263–66). Schrager complained to Bob Moore ("Moore"), another supervisor in the Ad–Art department, and to Pat McElwee ("McElwee"), the manager of the Ad–Art department, whenever LaRose filled in at the preprint department. (LaRose dep. at 266–67). In 1994, LaRose overheard Schrager tell Moore that he did not want LaRose to be assigned to the preprint department. LaRose also believed that Schrager told McElwee that he did not want her to work in the preprint department. (LaRose dep. at 266–68).

In November of 1994, an argument developed between Schrager and LaRose, and he "raised his hand to [her] and accused [her] of taking a long lunch." (LaRose dep. at 680). LaRose felt physically threatened by this action of Schrager. (LaRose dep. at 692). A meeting was held that day with McElwee, LaRose, Schrager, Moore, Marianne Herron of the human resources department, and Bernice Strange, a union representative, during which LaRose discussed the incident and informed them of other alleged harassment by Schrager. (LaRose dep. at 686–98). Another meeting was scheduled for January of 1995, but it was called off because LaRose brought her attorney to the meeting, which was against the policy of PNI, and the director of human resources and general counsel of PNI could not attend. (LaRose dep. at 701).

After this attempted meeting, Chris Bonaducci informed LaRose that she was going to investigate her claims of sexual harassment. However, Bonaducci did not interview LaRose or any of the women in the Ad–Art department which LaRose suggested until 1997, after this lawsuit was filed. (LaRose dep. at 717–23).

LaRose claims that she was constantly bypassed for overtime by Schrager. (LaRose dep. at 301–02, 535). Between 1990 and 1995, LaRose claims she should have received six more hours a week in overtime. Moore told LaRose that he would have given her more overtime, but that Schrager "gave him flack" for giving overtime to LaRose. (LaRose dep. at 437–39). One night, LaRose was asked to work overtime for Moore, but after Moore left, Schrager paced back and forth constantly and asked her "How long are you going to be?" Eventually, Schrager sent LaRose home. (LaRose dep. at 940–944).

As a result of this incident regarding the overtime, LaRose left on sick leave in April of 1996 because of the emotional stress she

was suffering. She did not return to work until January of 1997.

After she returned to work, Schrager continued to follow her. In May of 1997, Schrager followed her on a weekly basis.

LaRose testified that she suffered emotional distress, loss of sleep, loss of appetite, migraine headaches, and anxiety in and out of the workplace. (LaRose dep. at 896). LaRose maintains that she is afraid she will lose her job for refusing to give in to Schrager's sexual advances in 1983. (LaRose dep. at 897). Although LaRose began seeing a psychiatrist for her problems in November of 1995, she claims that her anxiety symptoms began in the mid1980s. (LaRose dep. at 904–05, 922). In addition, she claims that she suffers from a fear and distrust of men because of Schrager's conduct. (LaRose dep. at 1107–1109).

On April 10, 1995, LaRose filed a complaint with the PHRC. After receiving a right-to-sue letter from the PHRC, LaRose filed this complaint in this Court on May 2, 1997. LaRose still worked for PNI at the time these motions for summary judgment were filed.

## II.  STANDARD FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure provides that "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law" then a motion for summary judgment may be granted.

The moving party has the initial burden of illustrating for the court the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159–161, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The movant can satisfy this burden by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case," the movant is not required to produce affidavits or other evidence to establish that

there are no genuine issues of material fact. *Celotex,* 477 U.S. at 323–25, 106 S.Ct. 2548.

Once the moving party has made a proper motion for summary judgment, the burden switches to the nonmoving party. Under Rule 56(e),

> [w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party

The court is to take all of the evidence of the nonmoving party as true and to draw all reasonable inferences in his favor in determining if there is a genuine issue of material fact. *See Adickes,* 398 U.S. at 158–59, 90 S.Ct. 1598. In order to establish that an issue is genuine, the nonmoving party must proffer evidence such that a reasonable jury could return a verdict in her favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A proper motion for summary judgment will not be defeated by merely colorable or insignificantly probative evidence. *See id.* at 249–50, 106 S.Ct. 2505.

## III.  ANALYSIS

Courts have uniformly interpreted the PHRA consistent with Title VII. *See Clark v. Commonwealth of Pennsylvania,* 885 F.Supp. 694, 714 (E.D.Pa.1995); *Violanti v. Emery Worldwide A–CF Co.,* 847 F.Supp. 1251, 1257 (M.D.Pa.1994). Thus, I will analyze LaRose's claims only under Title VII; however, my analysis and conclusions are equally applicable to the claims of LaRose under both Title VII and the PHRA.

### A.  Timeliness of LaRose's Claims for Hostile Environment Sexual Harassment

■ The defendants argue that LaRose's claims which accrued before June 15, 1994 are time-barred under Title VII and the

PHRA. Under Title VII, a plaintiff must file a complaint with the Equal Employment Opportunity Commission (EEOC) within 180 days of the alleged discrimination or within 300 days of the alleged discrimination if the person has initially instituted proceedings with a state or local agency with authority to grant or seek relief form such practice, such as the PHRC.[4] 42 U.S.C. § 2000e–5(e). *See Rush v. Scott Specialty Gases, Inc.*, 113 F.3d 476, 480 (3d Cir.1997); *Stair v. Lehigh Valley Carpenters Local Union No. 600*, 813 F.Supp. 1112, 1114 (E.D.Pa.1993).

The Supreme Court has stated that "[f]iling a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, by a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). In cases in which there is a "discrete trigger event" or overt discrimination, this time restriction may be more inflexible than in cases in which a plaintiff does not know she has been harmed or where there is a continuing violation. *Rush,* 113 F.3d at 480–81 (citing *West v. Philadelphia Elec. Co.*, 45 F.3d 744, 754 (3d Cir. 1995)). In *Rush,* the Court of Appeals for the Third Circuit laid out the requirements for a plaintiff to show a continuing violation: (1) she must allege at least one act of discrimination that occurred within the 300 days, and (2) she must show a continuing pattern of discrimination, more than just isolated or sporadic acts of intentional discrimination. 113 F.3d at 481 (citing *West,* 45 F.3d at 754–755). A court should consider the subject matter, frequency, and permanence of the discrimination in discerning if there was a continuing pattern of discrimination, with permanence being the most important factor. *Id.* at 482 (citing *Berry v. Board of Supervisors of Louisiana State University,* 715 F.2d 971 (5th Cir.1983)). The factor of permanence indicates " 'whether the nature of the violations should trigger the employee's awareness of the need to assert her

rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate.' " *Hicks v. Big Brothers/Big Sisters of America,* 944 F.Supp. 405, 408 (E.D.Pa.1996) (quoting *West,* 45 F.3d at 755 n. 9).

In the context of a claim for hostile work environment sexual harassment, a plaintiff may include events that occurred outside the limitations period in her claim if it "would have been unreasonable to expect the plaintiff to sue before the statute ran on that conduct" or if the earlier conduct would only have been actionable in lights of events that occurred later within the limitations period. *Rush,* 113 F.3d at 482. However, a plaintiff must sue as soon as the harassment "becomes sufficiently palpable that a reasonable person would realize she had a substantial claim under Title VII." *Galloway v. General Motors Service Parts Operations,* 78 F.3d 1164, 1166 (7th Cir.1996); *see also Hicks,* 944 F.Supp. at 408; *Seals v. Oil Data, Inc.,* 107 F.3d 21 (10th Cir.1997) (noting that the plaintiff should have been aware that she could have asserted her rights earlier because the earlier alleged incidents were more serious in nature than the later incidents); *Dupont–Lauren v. Schneider (USA), Inc.,* 994 F.Supp. 802, 816 (S.D.Tex.1998) ("If a plaintiff knows or with the exercise of reasonable diligence would have known that she suffered from discrimination, she 'may not sit back and accumulate all the discriminatory acts and sue on all within the statutory period applicable to the last one.' ") (quoting *Moskowitz v. Trustees of Purdue University,* 5 F.3d 279, 282 (7th Cir.1993)).

LaRose argues that the allegations of a hostile environment are not time-barred because the harassment was ongoing until the time she filed her complaint and that she has alleged at least one act of discrimination within the three hundred day period.

The most severe conduct alleged by LaRose—that Schrager groped her at work, gave her a sexually explicit "coupon," and made other jokes, comments, and advances of a sexual nature—took place over ten years before she filed her PHRC complaint. In-

---

4. Under the PHRA, a plaintiff must file with the PHRC within 180 days of the discriminatory conduct. *See* 43 Pa. Cons.Stat. Ann. § 959(h). Because the filing period under the PHRA is

shorter than under Title VII, if some of LaRose's allegations are time-barred under Title VII, at least those same allegations are time-barred under the PHRA.

deed, the vast majority of LaRose's allegations against Schrager occurred before 1994, most incidents occurring in the mid–1980s. The gravity of these events should have indicated to LaRose or any reasonable person in her position that she had a substantial claim that her rights may have been violated.

Indeed, the defendants have presented evidence to support their contention that LaRose in fact knew her rights were being violated years before she filed her complaint with the PHRC. LaRose visited the PHRC in 1986 and 1990 in connection with the events at issue here. She testified at her deposition that she felt she had a claim for sexual harassment as early as 1986. While this Court does not condone the type of conduct that LaRose alleges happened in her workplace, to allow LaRose to proceed on her claims based on events that took place before June 15, 1994 after she waited for years to file her charge would undermine the congressional policy favoring the prompt filing of charges so as to facilitate the prompt resolution of employment disputes. *See Rush*, 113 F.3d at 485; *EEOC v. University of Pennsylvania*, 850 F.2d 969, 978 (3d Cir.1988).

I conclude that LaRose should have known and indeed, did know, that her rights were being violated in the mid–1980s. Thus, La-Rose is unable to show a continuing pattern of discrimination because the permanence of the events, as defined in *Rush* and *Hicks*, supra, occurring prior to June 15, 1994 forecloses her from including those events in her claim at this point. I conclude that she cannot proceed under a continuing violation theory of sexual harassment and any allegations that occurred before June 15, 1994 are barred as untimely and cannot support her claims.

**B. Merits of LaRose's Claim for Hostile Environment Sexual Harassment Based on Timely Allegations**

■ The defendants argue that when only the events that occurred on or after June 15, 1994 are considered, LaRose has not produced evidence to support a claim for hostile work environment.

■ Five elements must be proven to support a hostile work environment claim: (1) that the employee suffered intentional discrimination because of her sex; (2) that the discrimination was pervasive and regular; (3) that the discrimination detrimentally affected the plaintiff; (4) that the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability. *See Andrews v. City of Philadelphia*, 895 F.2d 1469,.1482 (3d Cir.1990).

■ In *Meritor Savings Bank, FSB v. Vinson*, the Supreme Court observed that the harassment must be pervasive or severe enough " 'to alter the conditions of [the victim's] employment and create an abusive working environment.' " 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (quoting *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir.1982)). In making this determination, the totality of the circumstances must be considered, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it reasonably interferes with an employee's work performance. *Id.* These factors are to be viewed objectively and subjectively, such that "conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 20, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

■ A plaintiff cannot rely upon casual, isolated, or sporadic incidents to support her claim of hostile work environment sexual harassment. *See Andrews*, 895 F.2d at 1482; *Harris*, 510 U.S. at 20, 114 S.Ct. 367. While it is possible for a single action to constitute a claim for hostile work environment sexual harassment if the act is "of such a nature and occurs in such circumstances that it may reasonably be said to characterize the atmosphere in which a plaintiff must work," generally a plaintiff must show that she was subjected to "repeated, if not persistent acts of harassment." *Bedford v. Southeastern Pennsylvania Transportation Authority*, 867 F.Supp. 288, 297 (E.D.Pa.1994). Indeed, some courts have required a plaintiff to show that she has been "subjected to continued explicit propositions or sexual epithets or persistent offensive touchings." *Miller v. Aluminum Co. of America*, 679 F.Supp. 495,

502 (W.D.Pa.), *aff'd,* 856 F.2d 184 (3d Cir. 1988).

LaRose asserts that the following occurred after June 15, 1994:(1) the denial of overtime by Schrager, (2) Schrager's changing and leaving errors in her work, (3) Schrager's standing too close to her on occasion, (4) the denial of computer training to LaRose, (5) Schrager's filing complaints against her to management, and (6) Schrager's following her and monitoring her at work. (LaRose dep. at 307–309). LaRose maintains that there are genuine issues of material fact surrounding these events, precluding summary judgment on her hostile environment claim.

Despite LaRose's assertions, it is clear from the record that the denial of computer training and the changing of only LaRose's work ceased by June 15, 1994. LaRose admitted that Schrager changed the work of all the artists in the department after 1989; indeed, LaRose produced no evidence that Schrager ever changed or left errors in her work because of her gender. (LaRose dep. at 584–585).

Even though LaRose claims that she was denied computer training within the three hundred day period, it is clear from her deposition testimony that she had access to computers in 1991 and received computer training from another employee in 1993. (LaRose dep. at 385, 387, 403). Even if this allegation were considered, LaRose produced no evidence linking the fact that she did not receive computer access or training to discrimination because of her gender; she produced no evidence that other male employees in her department worked on computers or received computer training while she or other women in the department were refused it.

The incidents and conduct which occurred after June 15, 1994 are not, as a matter of law, so severe or pervasive to alter the conditions of LaRose's workplace or create an abusive working environment. The only physically threatening event that LaRose alleges is when Schrager raised his hand to her, and that was an isolated incident. As for LaRose's allegation that Schrager filed complaints against her with management, LaRose produced evidence of only one complaint lodged against her by Schrager to

management after June 15, 1994. LaRose alleges that she suffered discrimination in the amount of overtime hours she was offered; however, she produced no evidence that she was given less overtime than other males or females in the department nor evidence of how often she allegedly was passed over for overtime.

As for LaRose's claims that Schrager stood too close to her and followed her in the office, the defendants maintain that such conduct is not pervasive or severe as a matter of law to support a claim for hostile work environment. LaRose did not produce evidence that this behavior was pervasive or that it altered the conditions of her employment in any way after June 15, 1994.

When considering the totality of the alleged conduct that occurred after June 15, 1994, I conclude that LaRose has not produced sufficient evidence such that a reasonable jury could return a verdict in her favor on her hostile environment claim. Thus, the defendants are entitled to summary judgment on that claim.

### C. LaRose's Claim for Intentional Infliction of Emotional Distress

■ The defendants claim that many of LaRose's allegations regarding her claim of intentional infliction of emotion distress are time-barred as well because there is a two-year statute of limitation on such claims under Pennsylvania law. In addition, the defendants argue that as a matter of law LaRose has not produced evidence of conduct that is outrageous, intentional, or reckless to support a claim for intentional infliction of emotional distress.

■ Under Pennsylvania law, conduct in the employment context will rarely rise to the level of outrageous conduct required to support a claim for intentional infliction of emotion distress. *See Andrews v. City of Philadelphia,* 895 F.2d 1469, 1487 (3d Cir. 1990) (noting that sexual harassment alone does not constitute outrageous conduct to state a claim for intentional infliction of emotional distress under Pennsylvania law); *Cox v. Keystone Carbon Co.,* 861 F.2d 390, 395 (3d Cir.1998) (applying Pennsylvania law and citing cases). Even if taken as true, LaRose's allegations of Schrager's conduct do

not rise to the level of outrageous conduct, even considering all allegations regardless of when they occurred. Thus, I conclude that the defendants are entitled to summary judgment on LaRose's claim for intentional infliction of emotional distress.[5]

## IV. CONCLUSION

Based on the foregoing analysis, the motion will be granted and judgment will be entered in favor of PNI, Schrager, and Knight–Ridder[6] on LaRose's claims of hostile environment harassment and intentional infliction of emotional distress.

---

**5.** The defendants also argue that this claim is barred by the Workers Compensation Act, 77 Pa. Stat. Ann § 481(a), which provides the exclusive remedy for injury suffered at the workplace, even for the intentional actions of the employer. Because I conclude that summary judgment will be awarded to the defendants on this claim on other grounds, I need not address this issue.

**6.** Knight–Ridder argues in its motion for summary judgment, in addition to joining in the motion filed by PNI, that it was not properly joined as a defendant in this action and alternatively that it is the parent corporation of PNI and not LaRose's employer. Because I conclude that summary judgment should be granted to all defendants on the merits of all of LaRose's claims, I need not and will not address this issue.