Teresa PITTMAN, Plaintiff,

v.

CONTINENTAL AIRLINES,
INC., Defendant.

Civil Action No. 97–CV–4968.

United States District Court,
E.D. Pennsylvania.

Feb. 3, 1999.

Colleen Marsini, John G. McDougall, Media, PA, for plaintiff.

Diane N. Apa, Jessamyne M. Simon, Klett Lieber Rooney & Schorling, Philadelphia, PA, for defendant.

## MEMORANDUM

KAUFFMAN, District Judge.

Plaintiff, Teresa Pittman ("Plaintiff"), has brought this action against Defendant Continental Airlines, Inc. ("Defendant") under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.* (1994) ("Title VII"), and the Pennsylvania Human Relations Act, 43 Pa. Cons.Stat. § 951 *et seq.* (1991) ("PHRA"). Plaintiff claims that Defendant discriminated against her on the basis of her gender, was responsible for her hostile working environment, and wrongfully retaliated against her for pursuing her rights. Defendant has moved for summary judgment. For the reasons set forth below, Defendant's Motion for Summary Judgment will be granted in part and denied in part.

## I. FACTS

The following facts have been taken from the submissions by the parties and viewed in a light most favorable to Plaintiff, the non-moving party.[1] Plaintiff began working for Defendant in Houston, Texas on October 21, 1990. On March 14, 1994, she transferred to Defendant's Philadelphia Airport location and began work at the ticket counter. Upon commencing work in Philadelphia, Plaintiff encountered flirtatious advances from Herbert Holmes ("Holmes"). Holmes was a supervisor from the luggage ramp area, known as the "Ramp," but was not Plaintiff's supervisor during her employment at the ticket counter. Holmes asked Plaintiff for dates, inquired about her personal life, and commented on her body. Plaintiff found Holmes's behavior unprofessional. At some point, Plaintiff mentioned Holmes's behavior to her supervisor, Jim Pleak ("Pleak"), in an attempt to discern the "general atmosphere" on the subject. It is unclear whether Plaintiff asked Pleak to do anything about the problem, and it does not appear that she registered a formal complaint. In any event, Pleak did not respond to Plaintiff's state-

---

1. While the Court will interpret discrepancies in the facts in a light favorable to Plaintiff, Plaintiff's "Response Contra Motion for Summary Judgment" contains factual assertions unaccompanied by citations to exhibits and unsupported upon the Court's examination of the parties' submissions. Moreover, some of the deposition pages to which Plaintiff cites are not among the exhibits attached to her Response. Facts alleged in a brief or motion without evidentiary support cannot be used to avoid summary judgment. *See Vendetta v. Bell Atlantic Corp.,* No. Civ. A. 97-4838, 1998 WL 575111, at *1 n. 1 (E.D.Pa. Sept.8, 1998) (Buckwalter, J.).

ment. Plaintiff eventually succeeded in convincing Holmes to leave her alone, and, for the most part, he focused his attentions elsewhere.

In July 1994, Plaintiff applied for a transfer to the Ramp, where Holmes worked as a supervisor. The General Manager, Lenny Gawlikowski ("Gawlikowski"), attempted to discourage Plaintiff from transferring by praising the work she was doing at the ticket counter. He also stated that the Ramp was a "men's locker room type" of environment and that, as a woman, Plaintiff would prefer to work at the ticket counter.[2] Nevertheless, Plaintiff received her transfer and began work on the Ramp in August 1994.

Upon reassignment to the Ramp, Plaintiff was humiliated by the issuance of a uniform that was two sizes too small. She was told by sources unidentified in the record that management had issued the ill-fitting uniform intentionally to humiliate her.

Plaintiff's first assignment on the Ramp was to the mailroom, which was removed somewhat from the actual loading ramp. She worked in the mailroom for a year, performing occasional overtime work on the loading ramp. In the mailroom, she worked alone or with one other coworker. During this period, Holmes did not annoy, act rudely towards, or bother Plaintiff. In her own words, during the first year, "everything was fine" for Plaintiff, and she "loved it" at the mailroom.

In August 1995, Defendant ceased using its own employees in the mailroom, and Plaintiff was assigned to work full-time at the loading ramp, under more direct supervision from Holmes. Now more commingled with the other Ramp employees, most of whom were male, Plaintiff encountered personal conversation and banter, some of which involved sex and sexual relationships.[3] Greg Mann ("Mann"), a Ramp employee, asked Plaintiff if she had received breast implants. When she responded in the affirmative, he asked if she had suffered from cancer. Plaintiff was not offended by Mann's questions, but did not "appreciate" the teasing that followed. Plaintiff complained to one of the "leads," Chris Hartman ("Hartman"), about working with Greg Strong ("Strong"), who was "just really getting into [her] personal life" and did not "know when to shut up."[4] Hartman instructed Strong to leave Plaintiff alone and allowed her to work in another area.

Plaintiff freely engaged in discussions about sex and the relationships between Ramp employees, but got out of the conversation when it became "graphic." She also did not object to her co-workers asking her out on dates, as long as they did not pursue the matter after she "definitely said no." During her tenure at the Ramp, Plaintiff flirted with and dated a Ramp employee, Tony Wyatt. She also telephoned a fellow Ramp employee, Frank White ("White"), at home and asked him why he would not accept a ride home with her and whether he was a homosexual. Some of the Ramp employees bothered Plaintiff, but overall, she enjoyed the atmosphere working there.

---

2. Later in her deposition, Plaintiff clarified that this earlier testimony did not represent a direct quote of Gawlikowski, but merely the "gist" of the conversation.

3. Plaintiff submits that she has described an "unchallenged account of pervasive harassment, which included comments and discussion about sex; breasts, crude and explicit comments on sexual activities and sexual position." (Pl.'s Br. Opp. Summ. J. at 31.) For support, Plaintiff cites her own deposition, pages 210 through 240, but fails to include those pages in her appendix of exhibits. The Court has examined the pages from that range (pages 210–240) that were included in Defendant's exhibits, and the facts gleaned therefrom have been considered. Moreover, in her statement of the facts, Plaintiff submits that

[t]he work atmosphere on the ramp was debasing, insulting, and hostile. On a daily basis Pittman encountered crude comments about her sex life or her breasts. There were pornographic pictures on her locker and on the company bulletin board. A male employee in a work bin improperly touched her and when she reported it to her "lead" she was advised to ignore the problem.

(Pl.'s Br. Opp. Summ. J. at 7.) Plaintiff does not cite to any evidence in support of this factual assertion, and the Court finds no such support in either Plaintiff's or Defendant's exhibits.

4. Plaintiff's deposition does not provide any more detail as to the content of the conversation with Strong.

Defendant maintained a progressive discipline system for lateness, attendance, and other discipline issues. "Instances" of lateness or absence were divided into "accountable" and "unaccountable" categories. Accountable instances were recorded for each employee on a one-year rolling basis. Each accountable instance would "roll-off" one year after its occurrence and would no longer count against the employee. Varying degrees of discipline resulted from each increase, with seven accountable instances warranting termination. Each time that an employee accrued an accountable instance, a supervisor would record the event with an "Absence from Duty Report," which the supervisor and the employee would sign. Shortly thereafter, the supervisor would also execute an "Attendance Review" form, which provided an updated balance of the employee's accountable instances, stated how many instances had been added and rolled-off since the last such report, and stated the date of the next instance roll-off.

Between October 20, 1994 and June 28, 1995 (all during Plaintiff's assignment to the mailroom), Plaintiff received four accountable instances, two for lateness and two for absence due to sickness. Her balance at the beginning of this period was two, and her balance at the end was three. (Three instances had rolled-off during that period.) On July 28, 1995, Plaintiff received another accountable instance for absence due to sickness, but the accompanying Attendance Review form stated her initial balance as four, leaving her with a balance of five. The form stated that her next roll-off would occur on August 7, 1995. On September 12, 1995, Plaintiff received another accountable instance for sickness, but the accompanying Attendance Review form failed to credit her with the roll-off that was supposed to occur in August, leaving her with a balance of six. Another instance for lateness occurred on October 12, 1995, leaving Plaintiff with a balance of seven ("the October 12 instance"). The next roll-off was to occur on October 22, 1995. On October 30, Plaintiff was late again, and received an accountable instance ("the October 30 instance"). Again, however, the records failed to reflect the passage of the October 12 roll-off date, leaving her with a balance of eight, one instance over the minimum for termination. On all of these records save the October 30 instance, Holmes was the supervisor preparer and signatory. When asked in his deposition about these errors, Holmes was unable to explain. The parties have stipulated that Plaintiff received no instance reports between July 31 and September 12, 1995.

The October 12 lateness, which provoked an instance report, was caused by a bomb scare near Plaintiff's apartment complex. A letter from Delaware police and Holmes's deposition testimony reveal that Plaintiff was late because all the roadways surrounding her apartment had been closed. Holmes chose to record this lateness as an accountable instance. The October 30 instance occurred because Plaintiff left her identification badge in her car when she arrived at work, which prevented her from clocking in on time. Holmes decided to hold Plaintiff responsible for an accountable instance.

Plaintiff signed each of the attendance instances listed above, but did not sign the June 28 and October 12 Attendance Review forms. The September 12 Attendance Review form, which Plaintiff signed and which left her with the (apparently inflated) balance of six, indicated that Plaintiff had received her "Final Termination Warning" and that another accountable instance (presumably before a roll-off) would result in termination.

Plaintiff has also testified in her deposition that towards the end of her tenure on the Ramp, Holmes "picked on" her and singled her out for discipline. When she asked Holmes about this problem, he replied, according to Plaintiff, "it would be different if you were nicer to me."

Defendant's employee handbook for cargo agents and customer service agents prohibits "[s]leeping, loafing on the job, or intentionally restricting output." Plaintiff knew of this general rule, but claims that it was not enforced in Philadelphia. Plaintiff avers, and has provided affidavits of Ramp employees in agreement, that Ramp employees slept freely during work hours with the full knowledge and acquiescence of the supervisors, including Holmes and Gawlikowski. Holmes testi-

fied in his deposition that he never saw any employees sleeping, but that he had seen employees lying down with their heads down and their eyes closed. Holmes claimed that he would ask these employees if they were sleeping, and they would respond, "no." Holmes accepted this and concluded that the employees were not sleeping but were merely resting. Gawlikowski testified in his deposition that he did not tolerate sleeping on the job.

In July 1995, the sleeping policy on the Ramp changed, as a "crackdown" on sleeping on the job occurred in response to complaints about mailroom employees not being present when required. Plaintiff was one of the first objects of the new enforcement effort. On July 3, 1995, while still working in the mailroom, she and White went to sleep during a slow point in the shift. Plaintiff soon woke up, and Holmes and another supervisor, Joni Jones ("Jones"), approached her and accused her of sleeping. Plaintiff freely admitted it, assuming that sleeping was not a discipline issue. She was surprised to learn that Ramp employees were not permitted to sleep. She received from Jones and signed a termination warning for the incident, which stated that termination may result if she were caught sleeping again.

Two other employees, Elizabeth Bagwell ("Bagwell") and Thomas Reardon ("Reardon"), also received written disciplinary notices as a result of the new enforcement effort. Plaintiff viewed the termination warning as a "big eye opener" with regard to the sleeping policy. She also believed that the motivation for the crackdown was to make a point to the mailroom employees about sleeping during shifts, by making an example of Plaintiff, Bagwell, and Reardon.[5] Management sent out a memo shortly thereafter confirming that sleeping was prohibited. Plaintiff testified that soon after the initial crackdown, however, all the Ramp employees, including those assigned to the mail-

room, resumed the usual practice of sleeping on the job, with little or no disciplinary ramifications.[6] Defendant does not explain whether the crackdown was a temporary, one-time effort or a permanent change in enforcement practice.

On October 31, 1995, after the closing of Defendant's mailroom operations and Plaintiff's assignment to full-time duty at the loading ramp, and one day after she received an accountable instance for leaving her badge in her car, Plaintiff went to sleep in the employee "smoke room." She was wearing a hat, sunglasses, and ear plugs. Gawlikowski, Holmes, and Anna Wright found Plaintiff and attempted to communicate with her, but she did not respond. On November 1, 1995, Plaintiff received a written Notice of Termination from Holmes. The notice listed the following reasons for termination: (1) as of October 17, 1995, Plaintiff had accumulated seven accountable attendance instances; (2) the lateness caused by leaving her identification badge in her car, recorded on October 30, 1995, creating a total of eight accountable instances; and (3) sleeping on the job despite having received a termination warning for same in July. After a review of her personnel file and consideration of her overall performance, Gawlikowski made the decision to fire Plaintiff.

Defendant permitted Plaintiff to resign rather than be terminated. She later decided to appeal her "termination." In January 1996, Plaintiff filed an appeal with Defendant's Human Resources Department in Houston. This effort apparently proved unsuccessful, and in March 1996, she filed a gender discrimination charge with the Pennsylvania Human Relations Commission (the "PHRC") and cross-filed with the Equal Employment Opportunity Commission (the "EEOC"). According to Plaintiff, Defendant became unwilling to cooperate with her after she filed this charge. Plaintiff filed the instant suit on August 25, 1997.

---

5. Apparently, Stanley Wells, a non-mailroom Ramp employee, was written up for sleeping around this time, but the record fails to explain this occurrence any further.

6. The affidavits of Continental employees who saw sleeping on the Ramp while supervisors

watched refer in general to the period when Plaintiff worked on the Ramp or to the year 1995, and thus the question of whether the crackdown lasted longer than Plaintiff claims remains open.

## II. DISCUSSION

A court may grant summary judgment when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *See Hersh v. Allen Prods. Co.,* 789 F.2d 230, 232 (3d Cir.1986); *Lang v. New York Life Ins. Co.,* 721 F.2d 118, 119 (3d Cir.1983). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. *Id.* Issues of irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Id.* In deciding whether there is a disputed issue of material fact, the court must resolve all doubt in favor of the non-moving party. *Meyer v. Riegel Prods. Corp.,* 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. denied,* 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984); *Smith v. Pittsburgh Gage & Supply Co.,* 464 F.2d 870, 874 (3d Cir.1972). The moving party always bears the initial burden of showing that no genuine issue of material fact exists, even if the non-movant would have the ultimate burden of persuasion at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The non-moving party, here Plaintiff, "may not rest upon the mere allegations or denials of" its pleading in order to show the existence of a genuine issue. Fed.R.Civ.P. 56(e). Plaintiff must do more than rely only "upon bare assertions, conclusory allegations or suspicions." *Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.), *cert. denied,* 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985) (citation omitted). Once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, the opponent "must do more than simply show that there

is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If the non-movant's evidence is merely "colorable" or is "not significantly probative," the court may grant summary judgment. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505. In deciding summary judgment, "[t]he role of the trial judge 'is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.' " *Weldon,* 896 F.2d at 797 (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

In her Complaint, Plaintiff asserts four claims: two claims of gender discrimination, one under Title VII and one under the PHRA, and two claims of illegal retaliation, one under Title VII and one under the PHRA.[7] The Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 (1993), 42 U.S.C. § 2000e–5(f)(3) (1994), and 28 U.S.C. § 1367 (1993). Plaintiff's discrimination claims rest on two theories of recovery: hostile work environment sexual harassment and discriminatory discharge on the basis of her gender. Thus, in substance, Plaintiff brings three claims: (1) sexual harassment, due to a hostile work environment; (2) discriminatory discharge; and (3) illegal retaliation.[8]

### A. Hostile Environment

Defendant argues that Plaintiff has failed to raise a genuine issue of material fact as to her hostile environment claim. In response, Plaintiff makes ample argument in support of Defendant's liability for sexual harassment, assuming that it actually occurred, but she makes little argument in response to Defendant's assertion that the environment in which she worked did not rise to an actionably hostile level.

▮▮▮▮ Title VII provides a cause of action to an employee who was subjected in her place of work to sexual harassment so perva-

---

7. Originally, Plaintiff also claimed "Wrongful Termination in Violation of Public Policy," but this claim was subsequently withdrawn on October 23, 1997.

8. The harassment and discrimination claims are brought under both Title VII and the PHRA, but

since "[c]ourts have uniformly interpreted the PHRA consistent with Title VII," *LaRose v. Philadelphia Newspapers, Inc.,* 21 F.Supp.2d 492, 497 (E.D.Pa.1998) (Reed. J.), they will be considered as single claims for the purposes of this Memorandum.

sive that it created a hostile, intimidating, or offensive work environment. *Andrews v. City of Phila.*, 895 F.2d 1469, 1482 (3d Cir. 1990). Hostile work environment claims require a showing of severe or pervasive conduct. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 2265, 141 L.Ed.2d 633 (1998). The working environment must be severe enough to affect the psychological stability of a minority employee. *Andrews*, 895 F.2d at 1482. Hostile environment claims require both an objective and a subjective showing; the environment must have been one that not only a reasonable person would find hostile and abusive, but which the actual Plaintiff in fact found to be hostile and abusive. *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998).

The Third Circuit has promulgated a five-factor test for a successful claim of hostile work environment sexual harassment: "(1) the employee[ ] suffered intentional discrimination because of [her] sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of *respondeat superior* liability." *Andrews*, 895 F.2d at 1482. The third factor requires a subjective showing of harm; the fourth an objective showing. *Id.* at 1483.

As an initial matter, not all of the facts of Plaintiff's case are actionable under her hostile environment claim. Under Title VII, a plaintiff must file a complaint with the EEOC within 300 days of the alleged discriminatory conduct if the plaintiff has filed a complaint with a local or state agency such as the PHRC. 42 U.S.C. § 2000e–5(3); *see also LaRose v. Philadelphia Newspapers, Inc.*, 21 F.Supp.2d 492, 498 (E.D.Pa.1998) (Reed, J.). Under the PHRA, a plaintiff must file with the PHRC within 180 days of the discriminatory conduct; thus, any facts barred for Title VII purposes are barred for purposes of the PHRA claim. 43 Pa. Cons.Stat. § 959(h); *see also LaRose*, 21 F.Supp.2d at 498. This

time requirement, however, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling, *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982), notably in cases involving a "continuing violation" of the plaintiff's rights. "The continuing violation theory allows a 'plaintiff [to] pursue a Title VII claim for discriminatory conduct that began prior to the filing period if he can demonstrate that the act is part of an ongoing practice or pattern of discrimination of the defendant.'" *Rush v. Scott Specialty Gases, Inc.*, 113 F.3d 476, 481 (3d Cir.1997) (quoting *West v. Philadelphia Elec. Co.*, 45 F.3d 744, 754 (3d Cir.1995)). To take advantage of the continuing violation theory, the plaintiff first must show that at least one discriminatory act occurred within the 300–day period. *Id.* The plaintiff also must demonstrate a continuing pattern of discrimination and show that the harassment does not consist simply of isolated or sporadic acts of discrimination. *Id.* "A plaintiff satisfying these requirements may present evidence and recover damages for the entire continuing violation, and the 300–day filing period will not act as a bar." *Id.*[9]

Defendant notes that Plaintiff filed her complaint with the PHRC on March 29, 1996 and argues that the alleged conduct of Holmes while Plaintiff worked at the ticket counter cannot be considered in an analysis of her harassment claim. Plaintiff makes no argument in response. Applying the 300–day limitations period, alleged acts occurring before June 2, 1995, which includes all of Plaintiff's time at the ticket counter, are unavailable to her claim unless they comprise part of a continuing violation. According to Plaintiff herself, however, she encountered little or no discrimination and no problems with Holmes during her first year on the Ramp. In fact, the record shows little evidence of any harassment within the 300–day period. Thus, Holmes's alleged conduct toward Plaintiff during her assignment to the ticket counter cannot be considered part of a continuing pattern of intentional discrimina-

9. In *Rush*, the Third Circuit analyzed three key factors in applying the continuing violation theory: (1) the similarity of the subject matter of the alleged acts of discrimination; (2) frequency and/or recurrence; and (3) permanence. *See Rush*, 113 F.3d at 482.

tion and will not be considered in the Court's analysis of Plaintiff's hostile environment claim.

■ The materials of record before the Court do not demonstrate the existence of a genuine issue of fact material to Plaintiff's claim that she suffered severe or pervasive sexual harassment. The only evidence of a hostile working environment stems from Plaintiff's conclusory statements in her deposition, which reveal little detail about the alleged acts of discrimination. Testimony that Plaintiff *occasionally encountered individuals who inquired about her personal life and extended conversations about relationships to a "graphic" level* does not support a finding for Plaintiff on the critical fourth factor in a successful hostile environment claim: that the atmosphere at the Ramp would have an objectively detrimental effect on a reasonable person in her position. " '[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.' " *Faragher,* 118 S.Ct. at 2283 (quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998)).

The conduct described by Plaintiff does not rise to the level of sexual hostility proscribed by Title VII. *See, e.g., Gares v. Willingboro Township,* 90 F.3d 720, 723–24 (3d Cir.1996) (reviewing jury verdict for plaintiff where supervisor called her "Township slut" and "tramp," touched her in a degrading manner, referred to her breasts as "bazooka-size," and laughed when her co-worker joked that an outside noise was really her "dildo"); *Spain v. Gallegos,* 26 F.3d 439, 449–450 (3d Cir.1994) (holding fourth requirement satisfied by a showing that plaintiff was subjected to pervasive malicious sexual rumors and ostracism); *Andrews,* 895 F.2d at 1486 (holding that court on remand should view name calling, pornography, displaying sexual objects on desks, recurrent disappearance of plaintiffs' work product, anonymous phone calls, and destruction of property as evidence of an objectively hostile environment); *Cooper–Nicholas v. City of Chester,* No. Civ. A. 95–6493, 1997 WL 799443, at *3–4 (E.D.Pa.

Dec.30, 1997) (Reed, J.) (finding plaintiff's work environment not severely hostile even though plaintiff's supervisor consistently made disparaging, vulgar, and offensive comments in public). The actionable facts, even viewed in the light most favorable to Plaintiff, do not show that Plaintiff suffered unwanted sexual advances, improper touching, insults, unreasonable criticism, the appearance of sexual imagery or pornography, obscene language or gestures, or any significant intrusions of a sexually hostile nature.

■ Moreover, Defendant has shown the absence of a genuine dispute as to the subjective requirement. "Title VII does not protect a plaintiff who experiences conduct that is merely offensive or annoying." *Maher v. Associated Servs. for the Blind,* 929 F.Supp. 809, 813 (E.D.Pa.1996) (Joyner, J.). Rather, Title VII is violated where the conduct is " 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). The record indicates that, overall, Plaintiff enjoyed working on the Ramp and the environment did not affect her psychological stability. There is little evidence that Plaintiff was offended at all by the atmosphere on the Ramp; in fact, much of the evidence indicates that Plaintiff, at least to a certain level, engaged freely in the banter among the Ramp employees. She dated a Ramp employee, flirted with him at work, and asked another if he was a homosexual. When conversation exceeded the level to which she was interested, she dealt with this well and does not appear to have been significantly affected.

No fair-minded fact finder, armed with the evidence presently before the Court, could return a verdict for Plaintiff on her hostile environment claim. Accordingly, the Court will grant summary judgment in favor of Defendant as to the hostile environment theory of Plaintiff's discrimination claim.

## B. Disparate Treatment

Plaintiff also claims that Defendant's decision to terminate her employment resulted from a sexually discriminatory motivation, in violation of Title VII and the PHRA. To state a *prima facie* case of disparate treatment under Title VII, and thus under the PHRA, a plaintiff must demonstrate the following elements: (1) she is a member of a protected class; (2) she was qualified for a position sought or held; (3) she was discharged from or denied the position; and (4) that non-members of the protected class were treated more favorably. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If the plaintiff carries her burden and presents a *prima facie* case, the burden then shifts to the defendant to offer a legitimate, nondiscriminatory reason for the plaintiff's discharge. *Id.*

Once the employer satisfies its burden, the spotlight shifts once again to the plaintiff, who is required to show, by a preponderance of the evidence, that the offered reasons are pretextual. *Id.* Thus, once the employer has satisfied its burden of production, the plaintiff may avoid summary judgment or judgment as a matter of law by offering evidence from which a rational trier of fact could either: (1) disbelieve the employer's offered reason; or (2) conclude that a discriminatory motive was more likely than not a motivating reason behind the employer's action. *Keller v. Orix Credit Alliance*, 130 F.3d 1101, 1108 (3d Cir.1997). The Third Circuit has stated that

> "[t]o discredit the employer's proffered reason, ... the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'"

*Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir.1994) (internal citations omitted) (quoting *Ezold v. Wolf, Block, Schorr & Solis–Cohen*, 983 F.2d 509, 531 (3d Cir.1992)).

Defendant asserts that Plaintiff has failed to state a *prima facie* case of disparate treatment, arguing that no issue of triable fact exists as to the question of whether male Ramp employees were treated more favorably than Plaintiff. Defendant notes that Plaintiff was fired for sleeping during her shift, after having been issued a final termination warning for such conduct. Plaintiff's employment record, notably her high number of attendance instances (eight), also supported her termination. Defendant asserts that Plaintiff has not proffered any evidence that male Ramp employees with similar disciplinary problems were not terminated and concludes that no issue of fact exists as to the third prong of Plaintiff's *prima facie* case.

Indeed, a female sexual discrimination plaintiff must show that male employees did not suffer similar adverse employment actions, despite displaying the same problem which provoked and supported the adverse action suffered by the plaintiff. *See Ludovico v. U.S. Healthcare, Inc.*, No. Civ. A. 96–61, 1997 WL 288592, at *6 (E.D.Pa. May 21, 1997) (Broderick, J.) (finding no issue of fact as to *prima facie* case where defendant fired female salesperson for missing sales quotas, but did not fire male salespersons who also missed sales quotas, because plaintiff had not shown that the males had missed their quotas as often or by as much as she did). Plaintiff has not shown that any of her male co-workers had identical or obviously worse employment records; *i.e.*, she has not shown that one or more of the men had eight or more attendance instances and were disciplined twice or more for sleeping on the job. She has, however, produced sufficient evidence to permit a fact finder rationally to conclude that some male Ramp employees, who did not suffer the same adverse action as Plaintiff, had employment records that were, on a qualitative level, worse or at least identical to hers. Hartman accumulated nine accountable attendance instances in 1993, but he was not terminated. Tom Reardon accumulated seven instances in December 1994

and was "terminated," but Defendant apparently permitted him to continue working, as he reached seven instances again in March 1995 and was "terminated" again. Tom Reardon continues to work on the Ramp, and received another instance from Holmes in December 1995. In 1995, Mike Marshall, a probationary employee on the Ramp, received four attendance instances, which is equivalent to seven instances for a non-probationary employee. During this probationary period, Mike Marshall also received a termination warning and a suspension for two "customer baggage mishandling incident[s]," but was not terminated.

Moreover, Plaintiff has called into question the legitimacy of the proffered reasons for her termination. The evidence shows that Holmes displayed sexual interest in her, and that she made clear her lack of reciprocal interest.[10] Plaintiff then transferred to a position under Holmes's supervision. On the Ramp, she accumulated an attendance record with unexplained inflations in her accountable instances. The October 12 and 30, 1995 instances could also be viewed by a trier of fact as unfair and inconsistent with Defendant's disciplinary practice. It also appears that Holmes was, for the most part, responsible for these records. Moreover, the discrepancies in Plaintiff's record sprang up coincidentally with her re-assignment from the secluded mailroom to full-time duty at the loading ramp. She quotes Holmes as stating that her time on the Ramp would be easier if she "were nicer" to him. Plaintiff has also raised a genuine question of fact as to Holmes's enforcement of the sleeping policy, through her own testimony and that of others that Holmes and other supervisors saw employees sleeping and did nothing. Holmes also appears to have been involved in Plaintiff's firing. Thus, even assuming that Plaintiff cannot convince a rational fact finder that males who were not fired had employment records sufficiently similar to hers,

she has adequately raised the question that her own record was intentionally distorted. This, in turn, raises the question that Plaintiff was treated less favorably than similarly situated males, and thus a genuine issue of fact exists as to the third element of her *prima facie* case.

Defendant also argues that Plaintiff has failed to show that its proffered reasons for firing Plaintiff, namely, that she accumulated eight instances and was caught sleeping on the job while on warning for same, are pretextual. The evidence shows that sleeping on the job and accumulating eight instances support termination under Defendant's relevant policies. The evidence also shows, however, that Plaintiff's instance total may have been the product of discriminatory motives and that the sleeping policy was not uniformly applied. Evidence also exists that the Ramp was considered a men's environment where women were less than welcome. Plaintiff's case of pretext is not yet ultimately convincing, as Gawlikowski made the final decision to fire her, with ample support from her record, and the extent of the effect on this decision of any records mismanagement or selective disciplining by Holmes remains unclear. These remaining issues, however, belong before a trier of fact. Plaintiff has, at least for the present, illuminated sufficient weaknesses in Defendant's proffered reasons for her termination to permit a reasonable fact finder to conclude that those reasons are simply a pretextual disguise for a discriminatory animus. Because such a conclusion, combined with Plaintiff's *prima facie* case, permits a finder of fact to infer discrimination, summary judgment must be denied.

## C. Retaliation

Defendant argues that Plaintiff cannot raise a genuine issue of fact as to her retaliation claim. Plaintiff appears to concede that

**10.** While the 300–day limitations period prevents the Court from considering Holmes's conduct toward Plaintiff at the ticket counter as actionable, these non-actionable events provide relevant background to an interpretation of the significance of subsequent events, such as the inconsistences in Plaintiff's attendance records and the apparent inconsistency in Defendant's enforcement of its sleeping policy. *See Rorie v. United Parcel Serv., Inc.,* 151 F.3d 757, 761 (8th Cir.1998) ("Even if a plaintiff is unable to show a continuing violation, ... instances of harassment occurring outside the [limitations] period may be admissible to provide relevant background to later discriminatory acts.").

she cannot succeed on her retaliation claim, as she makes no argument in support of it and failed to include retaliation in her summation of her claims in her "Response Contra Motion for Summary Judgment."

 Title VII makes it unlawful for an employer to retaliate against an employee who has "opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e–3(a). To establish a *prima facie* case of retaliation, Plaintiff must show the following: (1) she engaged in conduct protected by Title VII; (2) her employer took an adverse employment action against her; and (3) a causal link exits between her protected conduct and her employer's adverse action. *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 201 (3d Cir.), *cert. denied*, 513 U.S. 1022, 115 S.Ct. 590, 130 L.Ed.2d 503 (1994). Judging from Plaintiff's Complaint alone, she appears to claim that Defendant fired her for reporting sexual harassment that occurred while she was still employed. She also appears to claim that, after her termination, Defendant illegally retaliated against her for filing her claim with the PHRC by refusing to cooperate with her. Plaintiff's pursuit of these theories of recovery ends with her Complaint, however, and she has pointed to no evidence in support of them. Plaintiff has not identified when she reported harassment to Defendant or established a link between this alleged report and her firing. While the Supreme Court has recognized that Title VII covers post-termination retaliation, *see Robinson v. Shell Oil Co.*, 519 U.S. 337, 117 S.Ct. 843, 848–49, 136 L.Ed.2d 808 (1997), Plaintiff has not argued that failing to cooperate constitutes an adverse employment action or that it was causally linked to her filing the PHRC charge. Summary Judgment appears proper with regard to Plaintiff's retaliation claim.

### D. Punitive Damages

 All four of Plaintiff's claims include a demand for an award of punitive damages. In a recent decision, the Pennsylvania Supreme Court announced that punitive damages are not available to plaintiffs suing under the PHRA. *See Hoy v. Angelone*, 720 A.2d 745, 751 (Pa.1998) ("[W]e hold that punitive damages are not available under the [PHRA]."). Federal courts are constrained to apply the law of Pennsylvania when applying the PHRA. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). *Cf. Erie R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) ("Except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State."). Accordingly, Plaintiff's claims under the PHRA will be dismissed to the extent that they demand punitive damages.

Title VII allows for recovery of punitive damages when the plaintiff demonstrates that the Defendant discriminated against her "with malice or reckless indifference to [her] federally protected rights." 42 U.S.C. § 1981a(b). As noted, Plaintiff has raised genuine questions of fact regarding the legitimacy of the reasons for which she was terminated. If Plaintiff proves that Holmes, and possibly others, deliberately or recklessly falsified her records or inconsistently applied the sleeping policy, the fact finder would be entitled to award punitive damages. Punitive damages for the Title VII claims thus remains an issue for the trier of fact.

### III. CONCLUSION

Defendant has demonstrated the absence of any questions of material fact as to Plaintiff's sexual harassment claims and that it is entitled to judgment as a matter of law thereon. Plaintiff's retaliation claim also appears to lack merit. Genuine factual issues remain, however, on the claims of discriminatory discharge, and Plaintiff will be afforded the opportunity to prove those claims, except to the extent that they demand punitive damages under the PHRA.

An Order follows.

### *ORDER*

**AND NOW**, this 3rd day of February, 1999, upon consideration of Defendant's Mo-

**446**

tion for Summary Judgment, Plaintiff's Response thereto, and Defendant's Reply Memorandum, it is **ORDERED** that:

1. Defendant's Motion is **GRANTED IN PART** and **DENIED IN PART**.

2. Summary Judgment shall be entered in favor of Defendant on Plaintiff's claims for hostile work environment sexual harassment and illegal retaliation under both 42 U.S.C. § 2000e *et seq.* and 42 Pa. Cons.Stat. § 951 *et seq.*

3. To the extent that Plaintiff's claims for disparate treatment under 42 Pa. Cons. Stat. § 951 *et seq.* demand punitive damages, those claims are **DISMISSED**.

4. In all other respects, Defendant's Motion is **DENIED**.

**BY THE COURT.**