Lorraine E. BISHOP, Doreen Cain, and Judy Morris, Plaintiffs,

v.

NATIONAL RAILROAD PASSENGER CORPORATION, Defendant.

No. 98–CV–3852.

United States District Court, E.D. Pennsylvania.

Oct. 7, 1999.

Gregory L. Nester, Philadelphia, PA, for Plaintiffs.

John A. Guernsey, Bruse S. Harrison, Elizabeth Torphy–Donzella, Baltimore, MD, for Defendant.

### OPINION AND ORDER

VAN ANTWERPEN, District Judge.

Plaintiffs Lorraine E. Bishop, Doreen Cain, Judy Morris, and Patricia Thompson ("Plaintiffs") filed this action on July 23, 1998 against Defendant National Railroad Passenger Corporation ("Defendant") pursuant to Title VII of the Civil Rights Act of 1964.[1] Plaintiffs seek damages for claims of sex discrimination and sexual harassment.

### I. STANDARD OF REVIEW

We have before us Defendant's motion for summary judgment. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)("*Anderson I*"). A factual dispute is "material" only if it might affect the outcome of the suit under governing law. *Id.* at 248, 106 S.Ct. 2505. All inferences must be drawn and all doubts resolved in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.1985).

On motion for summary judgment, the moving party bears the initial burden of identifying those portions of the record that it believes demonstrate the absence of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To defeat summary judgment, the non-moving party cannot rest on mere denials or allegations, but must respond with facts of record that contradict the facts identified by the movant. *Id.* at 321 n. 3, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)); *see also First Nat. Bank of Pennsylvania v. Lincoln Nat. Life Ins. Co.,* 824 F.2d 277, 282 (3d Cir.1987). The non-moving party must demonstrate the existence of evidence that would support a jury finding in its favor. *See Anderson I,* 477 U.S. at 249, 106 S.Ct. 2505.

1. A fourth Plaintiff, Patricia Thompson, was dismissed from this case with prejudice on April 8, 1999, pursuant to Fed.R.Civ.P. 41(a)(1).

## II. FACTUAL BACKGROUND

The following facts have been taken from the submissions by the parties. Because this is a consideration on a motion for summary judgment, we view the facts in the light most favorable to Plaintiffs.

Each of the three Plaintiffs alleges that she was sexually harassed by Larry Platt. At all relevant times, Mr. Platt worked for Defendant, commonly known as Amtrak, as a first-level foreman. At the times relevant to the instant action, he worked in two of Amtrak's Delaware facilities, first in the "Wilmington" facility and then in the "Bear" location. Although Mr. Platt at various times worked in the same facility as one or more of the Plaintiffs, he was not the supervisor or foreman of any Plaintiff during any time period pertinent to this case. None of the allegations include physical touching or requests for sexual favors.

### A. Lorraine E. Bishop

Lorraine E. Bishop was hired by Amtrak in 1977. Bishop Dep. at 31. In 1986, she began working as a clerk in the Locomotive Shop ("Loco Shop") office, where she worked until 1991. *Id.* at 39–40, 57–59, 64, 74. Her foreman from 1989 to 1991 was Rick Parke. *Id.* at 67.

Mr. Platt was a foreman in the Loco Shop at the time Ms. Bishop worked there. *Id.* at 63, 65. Although he neither was Ms. Bishop's supervisor nor worked with her, he frequently was in the Shop office for work-related reasons and to visit Mr. Parke, with whom he was friendly. *Id.* at 67–68. According to Ms. Bishop, Mr. Platt came into the Loco Shop almost daily, more than any other foreman. *Id.* at 66.

Ms. Bishop claims that while she worked in the Loco Shop, approximately 1989 through 1991, she was harassed by Mr. Platt. *Id.* at 43–44, 68–69. Ms. Bishop's primary complaint is that Mr. Platt would

stand and stare at her, and that he made some comments and expressions that were sexual in nature. *Id.* at 68–69, 77, 72, 139. For instance, he once said that "he loved big women and he loved women with big breasts." *Id.* at 68–69. He would "leer" and "get into making remarks about body parts," once telling her that if she "played her cards right ... he could make life easier." *Id.* at 14–16, 72. He asked her some personal questions, including whether he could take her out on a date. *Id.* at 68. Also, Mr. Platt referred to himself as Ms. Bishop's "stud muffin," which Ms. Bishop claims became a running joke between Mr. Platt and Mr. Parke. *Id.* at 73–74.

Ms. Bishop told Mr. Parke about Mr. Platt's behavior. *Id.* at 77. Mr. Parke "laugh[ed] it off," so she complained to her manager, Ray Knight. *Id.* at 77, 80. Mr. Knight told Mr. Platt not to enter the shop when Ms. Bishop was alone, and asked her to leave if Mr. Platt went into the shop. *Id.* At 80–81. Thereafter, Mr. Platt cut down on his visits to Ms. Bishop's office. *Id.* at 84, 87. However, a window was installed in the wall of Ms. Bishop's office, and Mr. Platt would "stand[ ] at the window smiling ... and just leering ..." *Id.* at 85. Ms. Bishop did not complain further, as she "figure[d] ... nobody was doing anything anyway." *Id.* at 85, 87–88. Mr. Platt was also warned by Ms. Bishop's brother, who worked at Amtrak, to leave her alone. *Id.* at 117.

Mr. Platt was "bumped out" of Ms. Bishop's area in approximately 1991, ending his contact with her. *Id.* at 16. In 1993, Ms. Bishop went out on disability leave for reasons unrelated to the charges in this case, and she returned to Amtrak in January 1995. *Id.* at 134.

Ms. Bishop claims the staring and leering restarted when she returned from disability leave and continued through June 1996. *Id.* at 155.[2] Mr. Platt no longer

2. Although Ms. Bishop asserted repeatedly in her deposition that she was not harassed by Mr. Platt after she left the Loco Shop in 1991,

*see, e.g., id.* at 111, 112, we must view the facts in the light most favorable to her. Therefore, we assume for purposes of this

worked in Ms. Bishop's shop and was not frequently present, but "he . . . continued to come over for whatever reasons . . . and stand there, stare . . . until you couldn't take it anymore . . ." *Id.* at 155, 156. Also, he continued to call himself as "Lorraine's stud muffin." *Id.*

Ms. Bishop was aware of Amtrak's non-discrimination policies from her experience as a clerk in the Labor Relations Department in the 1980s. *Id.* at 44, 49–50. She knew, for instance, that an employee has the right to complain to the union and to management, and to go to higher levels if the response is not satisfactory. *Id.* at 51–52. She never saw any statements or policies concerning sexual harassment during 1989–1991, but she did receive an employee handbook describing Amtrak's sexual harassment policies. *Id.* at 54, 130.

## B. Doreen Cain

Doreen Cain was hired by Amtrak in March 1990 as a probationary coach cleaner in the Bear Maintenance Facility, where she worked for three months. Cain Dep. at 37, 42. She alleges that during those three months, Mr. Platt made various offensive statements to her at least ten to fifteen times. *Id.* at 49–51. *Id.* at 49, 52. For instance, he would ask her whether she was dating anyone, make comments about her dating situation, and ask other personal questions. *Id.* at 51. Mr. Platt was not her foreman and never had any supervisory or disciplinary power over Ms. Cain. *Id.* at 56, 57.

About a month after she was hired, Ms. Cain told her foreman, Bruce Carlton, that Platt was "bothering [her] and it made [her] feel really uncomfortable." *Id.* at 5355. She asked Mr. Carlton to sit with her while she worked, because Mr. Platt "would not leave [her] alone." Mr. Carlton began keeping an eye on her, and Ms. Cain was satisfied with this response. *Id.* at 53–55, 57.

Ms. Cain was transferred to an Indiana facility in June 1990, for reasons unrelated to the allegations in this case. *Id.* at 42–43. She had no interactions with Mr. Platt in Indiana. *Id.* at 42–43, 57.

In 1993, Ms Cain returned to work in Delaware, *id.* at 58, where she claims Mr. Platt subjected her on a few occasions to further offensive behaviors. *Id.* Ms. Cain and Mr. Platt had the "same type of conversations," *id.*, and a few times Mr. Platt, who left his shift as Ms. Cain arrived for hers, "did the same thing, staring whispering comments, the strange looks." *Id.* at 58. Ms. Cain does not know what Mr. Platt was whispering. *Id.* at 59.

Sometime in early 1996, Ms. Cain complained to her supervisor, Vince Nesci. *Id.* at 60–62, 70. Also, in early 1996 or thereabouts, Ms. Cain spoke generally with Roosevelt Gill, general foreman at Amtrak, about Mr. Platt's behavior.

Ms. Cain was advised, during an early 1996 meeting about sexual harassment, of Amtrak's policy against sexual harassment, as well as the provision for reporting harassing behavior. *Id.* at 117. She also had received a copy of the employee handbook describing Amtrak's sexual harassment policies.

Ms. Cain attended three sessions with a counselor in September 1998 because of the stress of bringing a lawsuit and personal matters unrelated to the instant case. Cain at 11–12. She has never sought counseling due to Mr. Platt's alleged behavior toward her, *id.* at 120, although she asserts that it caused her "a lot of fear" for her job, and that she "lost a lot of sleep for being afraid." *Id.* at 120.

## C. Judy Morris

Judy Morris was an electrician at Amtrak beginning in 1988. Pl.'s Compl. at ¶ 31; Morris Dep. at 42. She met Mr. Platt in the late 1980s or early 1990s, when

motion that these assertions were erroneous and that she was in fact subject to interac-

tions with Mr. Platt as recently as 1996, as she later claimed. *Id.* at 155.

she was working in the Loco Shop. Morris Dep. at 13, 21.

Mr. Platt, who at that time was not yet a foreman, would enter her shop and "stand there and stare . . . every day, a couple of times a day." *Id.* at 13. He asked her personal questions, such as where she lived. *Id.* Ms. Morris did not tell anybody, because she felt afraid and intimidated by the disproportionate number of men to women in the facility. *Id.* at 15. Ms. Morris's partner in the Loco Shop noticed that Mr. Platt was standing around the area, and told Mr. Platt to leave Ms. Morris alone. *Id.* at 18.

Ms. Morris transferred to the Electric Shop in 1991. *Id.* at 19. She contends that Mr. Platt would appear once a week or more and glare at her. *Id.* Also, he stood by the time clock, watching her and other people "come in and he would glare at them with this goofy grin on his face." *Id.* at 19, 25. Ms. Morris complained to her foreman, Tommy Reese, but the frequency of the staring did not decrease. *Id.* at 19–20. However, Ms. Morris asked Mr. Reese not to involve anybody else. *Id.* at 51.

It appears that Ms. Morris transferred to the Bear facility in April 1995, where she still works. *Id.* at 19; Def.'s Brief, Ex. 7. Mr. Platt transferred to Bear in September of the next year. Morris Dep. at 19. Ms. Morris was able to avoid Mr. Platt at Bear because his shifts did not always overlap with hers. *Id.* at 31, 66. According to Ms. Morris, the "staring instances . . . were much fewer when [Mr. Platt] was at Bear. . . ." *Id.* at 67. However, he continued to stare at her. *Id.* at 68–69. Also, he made comments to other men, and though she could not hear the remarks, she assumed "just by the expression and his gestures" that they were derogatory. *Id.*

Upon Mr. Platt's 1996 transfer to Bear, Ms. Morris and Ms. Cain spoke with Vince Nesci about their concern that Mr. Platt might act as their boss if he ever filled in for their foreman. *Id.* at 59. Ms. Morris

also complained to her Foreman, Freddie Dutton, and asked Mr. Dutton to keep Mr. Platt away from her if they had to work in the same area, which he did. *Id.* at 68. Ms. Morris didn't feel anything that happened at the Bear facility was serious enough to warrant a complaint, although she remained frightened. *Id.*

Ms. Morris became aware of Amtrak's sexual harassment policy and procedures during her employment orientation. *Id.* at 16. She understood throughout her employment that she could file a sexual harassment claim against Mr. Platt, and she was aware of the complaint procedure and her rights with regard to sexual harassment. *Id.* at 29, 62. Also, she and the other Plaintiffs received the company's Standards of Excellence booklet that contained the company's discrimination policy, and attended a 1996 brown bag lunch on sexual harassment. *Id.* at 61, 75.

Ms. Morris has not suffered any physical symptoms of stress, nor did she consult any medical or mental health professionals with respect to any of the allegations in the instant case. *Id.* at 78–79.

## D. Amtrak's Investigation

Sheila Davidson was hired in August 1992 as Amtrak's EEO representative, responsible for investigating allegations of sexual harassment. She was promoted to EEO Manager in September 1997. Davidson Aff. at ¶¶ 1, 2. According to Ms. Davidson, Amtrak advises employees of its sexual harassment policies and procedures by distributing to all employees its Standards of Excellence booklet, which "contains a statement of the Company's intolerance for harassment," and an EEO Internal Complaint Procedures Handbook, as well as by posting the policy throughout the company. *Id.* at ¶ 3–5. Each of the Plaintiffs received the booklet and had seen the postings. Also, the Plaintiffs and Mr. Platt were represented by unions throughout their Amtrak employment. *Id.* at ¶ 6.

Mr. Platt's alleged behavior toward various female Amtrak employees first came to Ms. Davidson's attention in 1996, when she investigated the complaint of Martha Allen. *Id.* at ¶¶ 7–8. Ms. Allen had indicated that others, including Ms. Bishop, Ms. Cain and Ms. Morris, would have relevant information and Ms. Davidson interviewed each of them in connection with the investigation. Morris Dep. at 54; Bishop Dep. at 99–102; Davidson Aff. at ¶ 9–10. The Plaintiffs did not report the alleged harassment to Ms. Davidson or other company management before that time. *Id.* at 72.

After investigating, Ms. Davidson concluded that any offensive behavior by Mr. Platt against the three Plaintiffs had occurred years earlier, and that Mr. Platt therefore could not be disciplined for that conduct. *Id.* at ¶ 15. Although she ultimately decided that the charges by Ms. Allen were not severe enough for formal charges, Ms. Davidson met with Mr. Platt and his union representative to review Amtrak's sexual harassment policy. In June 1996, Ms. Davidson explained to the Plaintiffs the outcome of her investigation, stressing that they should bring any future problems to her attention. Thereafter, none of the Plaintiffs raised any complaints about Mr. Platt.

In October 1996, Vince Nesci, the General Manager at the Bear facility, informed Ms. Davidson that Jennifer DeCesare had filed a grievance against Mr. Platt. *Id* at ¶ 18. After an investigation and hearing, Mr. Platt was terminated on January 4, 1997. Davidson Aff. at ¶ 19. Upon his appeal, the Public Law Board determined that termination was excessive discipline, and ordered Amtrak to reinstate him. Mr. Platt returned to work in January 1999. *Id.* at ¶ 20.

Each of the three Plaintiffs filed a charge of sex-based discrimination with the Equal Employment Opportunity Commission ("EEOC") on December 2, 1996.

Def.'s Br., Exs. 11, 12, 14. Each has been issued a right to sue letter by the EEOC.

## III. DISCUSSION

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Under the statute, an employer is prohibited from discriminating with regard to an employee's compensation, terms, conditions or privileges, which is referred to as quid pro quo harassment. Additionally, Title VII prohibits discrimination, gender-based and otherwise, that is sufficiently severe and pervasive as to alter the conditions of employment and create a hostile or abusive work environment. *See Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993). Plaintiffs seek to establish that they suffered sexual harassment because of a hostile work environment.

### A. CONTINUING VIOLATION

We agree with the Defendant that not all of the facts of the Plaintiffs' case are actionable under the hostile environment claim. Under Title VII, a plaintiff ordinarily must file a charge of employment discrimination with the EEOC within 180 days of the alleged unlawful employment practice, or within 300 days if proceedings have been already instituted with a state or local agency with appropriate authority. 42 U.S.C. § 2000e–5(e)(1); *see also LaRose v. Philadelphia Newspapers, Inc.,* 21 F.Supp.2d 492, 498 (E.D.Pa.1998). Thus, in the instant case, the retrospective limitations period that ordinarily would bar claims for earlier events began to run on approximately June 5, 1996, 180 days before the December 2, 1996 filing date.[3]

---

3. Nothing in the record indicates that Plaintiffs filed a complaint with any authority other

However, in cases that do not involve a discrete trigger event of overt discrimination, such as where the violation of the plaintiff's rights is continuous and ongoing, "the filing of a timely charge is 'a requirement that . . . is subject to waiver, estoppel, and equitable tolling.'" *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982); *West v. Philadelphia Elec. Co.*, 45 F.3d 744, 754 (3d Cir.1995) (citations omitted). Under this "continuing violation" theory, a plaintiff can pursue a Title VII claim for "conduct that began prior to the filing period if he [or she] can demonstrate that the act is part of an ongoing practice or pattern of discrimination . . ." *West* at 754. First, a plaintiff must demonstrate that at least one act took place within the 180–day period. *West*, 45 F.3d at 754. Second, the plaintiff must establish a continuing pattern of discrimination rather than "the occurrence of isolated or sporadic acts of intentional discrimination." *Id.* at 775. Once these requirements are satisfied, a plaintiff may "present evidence and recover damages for the entire continuing violation period." *Rush v. Scott Specialty Gases, Inc.*, 113 F.3d 476, 481 (3d Cir.1997).

The Third Circuit has enumerated several factors to consider in whether a continuing violation has been demonstrated:

> "The first is subject matter. Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring . . . or more in the nature of an isolated work assignment or employment decision? The third factor, perhaps of most importance, is degree of permanence. Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate?"

*Rush* at 482 (*quoting Berry v. Board of Supervisors of Louisiana State Univ.*, 715 F.2d 971 (5th Cir.1983)). A plaintiff "may not base her . . . suit on conduct that occurred outside the statute of limitations unless it would have been unreasonable to expect the plaintiff to sue before the statute ran on that conduct . . ." *Rush* at 482 (*quoting Galloway v. General Motors Serv. Parts. Operations,* 78 F.3d 1164, 1166 (7th Cir.1996)) (a plaintiff must sue before the harassment "become[s] sufficiently palpable that a reasonable person would realize she had a substantial claim").

In *Rush,* for instance, the evidence showed that the harassment grew in intensity and frequency, and that initially the plaintiff could not have realized how pervasive was the harassment. *Rush* at 483; *see also West* at 755–56. Rather, the primary harasser initially "treated [the plaintiff] nicely, and, although perhaps overly attentive, his behavior was not problematic." *Id.* at 482. Additionally, the harassment eventually occurred on a daily basis, running into the 300–day period before the plaintiff filed her complaint with the EEOC. *Id.* at 482–483. The ongoing nature of the harassment as well as the fact that it intensified allowed the plaintiff to sue for the continuing violation period. *Id.*

### i. Ms. Bishop

Ms. Bishop cannot sustain a claim of continuing violation covering the alleged harassment that occurred from 1989 through 1991. According to Ms. Bishop's own deposition testimony, she had no contact with Mr. Platt from 1991 until she returned from disability leave in 1995. She admits that she was not subject to any offensive acts by Mr. Platt during that approximately four-year period. Even if

---

than the EEOC. We therefore consider that the applicable limitation period in this case is 180 days under the statute.

the alleged acts were all similar to one another, the lengthy interruption "destroyed the pattern" of harassment. *See Konstantopoulos v. Westvaco Corp.,* 112 F.3d 710, 715 (3d Cir.1997).

■ In *Konstantopoulos,* the Third Circuit held that a break of seven months between two employment time periods precluded the plaintiff from claiming a continuing violation covering alleged acts before the seven-month interruption. *Id.; see also Lesko v. Clark Publisher Serv.,* 904 F.Supp. 415, 420 (M.D.Pa.1995) (a two-year passage between the first and second alleged harassing instances "indicates that they were separate and distinct"). Because the break allowed the effects of the earlier acts to dissipate, those acts should not have been considered part of a pattern continued after the break. *Id.*[4]

Clearly, the approximately four-year break in Ms. Bishop's situation, including three years in which she did not report to work because of a disability leave, bars any acts alleged to have occurred before Mr. Platt was bumped in 1991 from coverage by the continuing violation theory. As effects can dissipate in a period of seven months, then in four years they must be virtually nonexistent for purposes of continuing violation. We therefore cannot consider any acts that occurred prior to Ms. Bishop's return from disability leave.

■ Viewing the facts in the light most favorable to Ms. Bishop, we must accept that the staring and leering, as well as references by Mr. Platt to himself as "Lorraine's stud muffin," started again in January 1995 and continued through June 1996, which date falls just within the 180-day

limitations period. Bishop Dep. at 155. Mr. Platt was no longer working in Ms. Bishop's shop, and the contacts therefore were infrequent. Id. at 155, 156.

We therefore will allow her claim that any offensive acts that occurred after January 1995 can be considered under the continuing violation theory. The alleged acts are related; indeed, Ms. Bishop did not distinguish between individual offenses, but simply claimed that they all were instances of leering, staring, and calling her Mr. Platt's "stud muffin." Based on the facts before us, we cannot distinguish between individual acts or determine whether there was any noticeable break during the eighteen months leading up to June 1996. The facts indicate that the subject matter, frequency, and degree of permanence could have been such as to constitute a continuing violation.

### ii. Ms. Cain

■ Similarly, we find that Ms. Cain's claims for alleged harassment that occurred prior to her 1990 transfer to Indiana are barred by the 180-day filing requirement. *See Rush* at 482–483. Ms. Cain was absent from the Delaware facilities for approximately three years, and any offensive acts that occurred prior to that absence cannot be considered part of a continuing violation. *See Konstantopoulos* at 715; *Lesko* at 420.

■ However, for purposes of the Defendant's summary judgment motion, we will consider the acts alleged by Ms. Cain to have occurred between 1993 and 1996. The record does not reflect sufficient facts, nor does Defendant offer any, for us to

---

4. This analysis is not limited to the Third Circuit, but is typical of the law on limitations periods in discrimination cases. For instance, the Seventh Circuit has held repeatedly that "for various acts of sexual harassment to be joined together into a single claim ... the acts must be reasonably close to each other, in time and circumstances, because [a]cts ... so discrete ... that they do not reinforce each other cannot reasonably be linked together into a single chain, a single

course of conduct, to defeat the statute of limitations." *Garrison v. Burke,* 165 F.3d 565, 570 (7th Cir.1999) (quoting *Koelsch v. Beltone Electronics Corp.,* 46 F.3d 705, 707 (7th Cir.1995)). A two-year gap between encounters that took place outside the statute of limitations and encounters that fall within the statute of limitations would be "too significant of a break [in time] to permit a finding that plaintiff was subjected to a pattern or continued series of harassing acts." *Id.*

determine the frequency or permanence of the alleged acts, which allegedly ceased in 1997. Cain Dep. at 126. Because we must resolve all doubts and draw all inferences in favor of the non-movant, *see Diebold* at 655, 82 S.Ct. 993, *Gans* at 341, we find that there are genuine issues of material fact with respect to the 1993 through 1996 period. We therefore will consider the allegations of harassment during the period as part of a continuing violation that was timely filed on December 2, 1996.

### iii. Ms. Morris

■ With respect to Ms. Morris's claims, although her separation from Mr. Platt was significantly shorter than that of either Ms. Bishop or Ms. Cain, under the same reasoning as above we find that any allegations from the time period before Mr. Platt transferred to Bear are barred. According to her summarized Employment History and her deposition testimony, Ms. Morris transferred from the Wilmington facility, where Mr. Platt worked, to the Bear facility in April 1995. *See* Def.'s Br., Ex. 7. Mr. Platt did not transfer to the Bear Facility until September 1996. The seventeen month period when Mr. Platt and Ms. Morris had no contact is too great for her claim to cover any acts occurring before that period. *See Rush* at 482–483; *Konstantopoulos* at 715; *Lesko* at 420.

The acts alleged to have occurred from September 1996 all fall within the 180–day filing period. Therefore, the continuing violation theory is not applicable to those acts, and we can properly consider them under Title VII's filing requirements in our determination of Ms. Morris's hostile work environment claim. *See* 42 U.S.C. § 2000e–5(e)(1).

### B. HOSTILE WORK ENVIRONMENT

■ We turn now to the claims of hostile work environment by each of the

Plaintiffs, considering only those claims that are not time-barred. The United States Supreme Court has concluded that a plaintiff may establish a Title VII violation if she can show that gender-based discrimination created a hostile or abusive working environment. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). As we previously stated, a hostile work environment claim involves sexual harassment so severe and ubiquitous that it would alter the conditions of a plaintiff's employment and create an abusive working environment.[5] *Id.* at 67, 106 S.Ct. 2399.

■ The Supreme Court has held that a court deciding a hostile environment claim must examine the totality of the circumstances, including: frequency and severity of the conduct, whether the conduct is physically threatening or humiliating, and whether the conduct unreasonably interferes with an employee's performance at work. *Harris,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295. The Third Circuit Court of Appeals therefore requires five elements for a successful gender-based discrimination claim against an employer:

> "(1) the employee suffered intentional discrimination because of [her] sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability."

*Andrews v. City of Philadelphia,* 895 F.2d 1469, 1482 (3d Cir.1990); *Kunin v. Sears Roebuck and Co.,* 175 F.3d 289, 293 (3d Cir.1999); *see also West v. Philadelphia Elec. Co.,* 45 F.3d 744, 753 (3d Cir.1995); *Spain v. Gallegos,* 26 F.3d 439, 447 (3d Cir.1994).

---

5. Sexual harassment is also actionable under the quid pro quo theory. *See Robinson v. City of Pittsburgh,* 120 F.3d 1286 (3d Cir.1997). As none of the Plaintiffs in this case claim that they were denied or offered any economic or other employment-related benefit, there is not a quid pro quo harassment claim to consider in this case.

In determining whether a work environment is objectively hostile, courts are not to examine the scenario on an incident-by-incident basis, but instead must consider the totality of the circumstances. *Andrews*, 895 F.2d at 1485; *Stair v. Lehigh Valley Carpenters Local Union No. 600*, 813 F.Supp. 1116, 1119 (E.D.Pa.1993). An objectively hostile work environment can arise, for instance, from the frequent use of insulting and derogatory language relating to women. *See Andrews*, 895 F.2d at 1485–86 (quoting *Bennett v. Corroon & Black Corp.*, 845 F.2d 104, 106 (5th Cir.1988)). However, "isolated or single incidents of harassment are insufficient to constitute a hostile environment." *Rush* at 482 (citations omitted). Also, Title VII does not protect a plaintiff who experiences conduct that is merely offensive or annoying. *Harris* at 21, 114 S.Ct. 367 (quoting *Meritor*, 477 U.S. at 67, 106 S.Ct. 2399).

Neither party in this case disputes that each Plaintiff was subjected to the alleged offensive acts because of her sex, and we therefore accept for purposes of the motion before us that the acts at issue were due to Plaintiffs' sex. However, we find that the acts we can consider under the time limits imposed by law were neither severe nor pervasive, nor would be sufficiently detrimental to create a hostile work environment. At most, during the statutory period, each Plaintiff was on occasion made to feel uncomfortable and annoyed. None of Mr. Platt's behaviors toward the Plaintiffs altered the terms or conditions of employment, as clearly required for a hostile environment claim. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 2293, 141 L.Ed.2d 662 (1998) at 2284 ("conduct must be extreme to amount to a change in the terms and conditions of employment"); *see also Pasqua v. Metropolitan Life Ins. Co.*, 101 F.3d 514 (7th Cir. 1996).

### i. Ms. Bishop

Ms. Bishop's claims include offensive acts beginning in January 1995 and continuing through June 1996. Again, we view the facts of record in a light most favorable to the Plaintiff, and must determine whether the staring, leering, and comments by Mr. Platt that he was "Lorraine's stud muffin," the only acts alleged during the 1995 to 1996 time period, constitute a Title VII violation.

During the relevant time period, Mr. Platt was no longer working in Ms. Bishop's shop, and therefore had infrequent contacts with her. Id. at 155, 156. Because no facts in the current record provide the exact frequency of the contacts, we will assume solely for purposes of this motion that the behavior was sufficiently regular under the law.

However, we find that none of the alleged acts approach the requisite severity or pervasiveness. As the Supreme Court has held, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment ... is beyond Title VII's purview." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998) (quoting *Harris*, 510 U.S. at 21, 114 S.Ct. 367); *see also Meritor*, 477 U.S. at 67, 106 S.Ct. 2399. There is no allegation or evidence that the "behavior [was] so objectively offensive as to alter the 'conditions' of the victim's employment.'" *See Oncale*, 118 S.Ct. at 1003. Additionally, no threats of physical force—which are not necessary for a finding of sexual harassment but can be an important factor in determining severity—are alleged in the instant case. *See Harris* at 22, 114 S.Ct. 367.

Rather, the conduct described by Plaintiff does not rise to the level of sexual hostility proscribed by Title VII. *See, e.g., Andrews*, 895 F.2d at 1486 (holding that the court on remand should view name calling, pornography, displaying sexual objects on desks, recurrent disappearance of plaintiffs' work product, anonymous phone calls, and destruction of property as evidence of an objectively hostile environ-

ment); *Cooper–Nicholas v. City of Chester,* 1997 WL 799443, at *3–4 (E.D.Pa. Dec. 30, 1997) (finding plaintiff's work environment not severely hostile although plaintiff's supervisor consistently made disparaging, vulgar, and offensive comments in public). The material facts, viewed in the light most favorable to Ms. Bishop, do not show that she "suffered unwanted sexual advances, improper touching, insults, unreasonable criticism, the appearance of sexual imagery or pornography, obscene language or gestures, or any significant intrusions of a sexually hostile nature." *Pittman v. Continental Airlines, Inc.,* 35 F.Supp.2d 434 (E.D.Pa.1999).

Rather, the allegations by Ms. Bishop are similar to those in *Konstantopoulos v. Westvaco Corp.,* in which gestures including "squinting their eyes and shaking their fists" were considered to be troubling but not "particularly severe." 112 F.3d 710, 716 (3d Cir.1997). In the instant case, Mr. Platt seems to have succeeded at most in making Ms. Bishop's work environment uncomfortable on occasion, a regrettable but not actionable occurrence.

With regard to the requirements of detrimental effect, we find, weighing all the evidence heavily in Ms. Bishop's favor, that a genuine issue of material fact might exist. Although Mr. Platt's behavior was not severe enough to create a hostile work environment, Ms. Bishop claims that she "felt intimidated, scared and defeated." Bishop Dep. at 155. Giving Ms. Bishop the benefit of the doubt, we find that those feelings might be construed as a subjective detrimental effect. However, we note that this finding is due only to the current posture of the present case, as Ms. Bishop makes no claim that she suffered any iden-

tifiable ill consequences, such as inability to do her work or to do it properly, absences from work, or any psychological detriments, from Mr. Platt's behavior.

▮▮▮▮▮ We find that, whatever Ms. Bishop's symptoms, she has not set forth evidence from which a jury could conclude that she endured a work environment detrimental to a reasonable woman in her position. We note that Title VII is not "designed to protect the overly sensitive plaintiff." *Harley v. McCoach,* 928 F.Supp. 533, 539 (E.D.Pa.1996); *see also Andrews,* 895 F.2d at 1483. Therefore, even assuming that Mr. Platt's behavior occurred with some frequency, contacts consisting merely of staring, leering, and "stud muffin" comments, with no physical touching or threats and no sexual overtones, cannot meet the objective test for detrimental effect, however annoying they may be.[6] This is particularly so in light of the dearth of consequences suffered by Ms. Bishop, as her work and personal life appear not to be been interfered with at all during the relevant time period. *See Faragher,* 524 U.S. 775, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662. At most, Ms. Bishop suffered the "mere offensive utterance" not contemplated by Title VII, rather than the "extreme" contemplated by the Supreme Court. *See id.*

We note that a number of cases, including a recent case in this circuit involving the identical defendant and the same alleged harasser, found that behavior arguably more severe than any in the instant case did not rise to the level of hostile environment. *See DeCesare v. National Railroad Passenger Corp.,* 1999 WL 330258 (E.D.Pa.1999).[7] In a recent case,

---

6. Of course, "offensive conduct is not necessarily required to include sexual overtones in every instance ... to detrimentally affect a female employee." *Andrews* at 1485. A court "may not properly discount that part of the total scenario that does not include an explicit sexual component" from its determination of whether the workplace was objectively hostile. *Harley v. McCoach,* 928 F.Supp. 533, 540 (E.D.Pa.1996).

7. Unlike in the instant case, Mr. Platt was the foreman, and therefore direct supervisor, of the *DeCesare* plaintiff. In that case, plaintiff actually went on disability leave because of the "stress accompanying Platt's harassment of her." Id. at *1.

*LaRose v. Philadelphia Newspapers*, the defendant was granted summary judgment because the plaintiff claims, including that the alleged harasser "stood too close to her and followed her in the office" and once raised his hand to her, were insufficient to satisfy the requirement of severe and pervasive behavior. 21 F.Supp.2d 492, 500.

### ii. Ms. Cain

■■■ Ms. Cain claims that "Mr. Platt made several degrading and offensive remarks to plaintiff and subjected her to harassment of a sexual nature and intimidation." Pl.'s Compl. at ¶ 23. While we do not belittle the discomfort of these isolated instances, "several remarks" over the course of greater than three years cannot sustain a hostile environment claim.

First, nothing in the record suggests that Mr. Platt's contacts with Ms. Cain "'occur[red] either in concert or with regularity,'" a pervasiveness required for hostile environment findings. *Andrews* at 1483 (quoting *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189 (2d Cir.1987)). Rather, according to Ms. Cain's testimony, her interactions with Mr. Platt were limited and attenuated. She stated that, after she returned to Delaware in 1993, she "saw him a few times," and agreed with the Defendant's attorney that over the subsequent "five years there have been a few instances." Cain Dep. at 58. Because the Third Circuit has specifically held that "isolated or single incidents of harassment are insufficient to constitute a hostile environment," *Rush* at 482, occasional episodes of harassing behavior, such as those in Ms. Cain's case, will not warrant Title VII relief. The "few instances" alleged by Ms. Cain are not more than "casual, isolated or sporadic incidents," and manifest no regularity that can reasonably be termed pervasive. *See Tomka v. Seiler Corp.*, 66 F.3d 1295 (2d Cir.1995); *Andrews*, 895 F.2d at 1482; *Harris*, 510 U.S. at 20, 114 S.Ct. 367.

■■■ Moreover, the contacts were not severe. As Ms. Cain testified, she "had a few little dealings with [Mr. Platt], comprising only a [f]ew little conversations ... staring ... whispering comments ... [and] strange looks." Id. at 58–59, 114 S.Ct. 367. As the court explained in *Konstantopoulos*, and as we discussed at some length above, "mute gestures ...—squinting their eyes and shaking their fists—... cannot in itself be characterized as particularly severe." *Id.* at 716. No threats of physical force are alleged by Ms. Cain, and the conduct at issue does not rise to the level of sexual hostility proscribed by Title VII, as discussed at length in the preceding section. *See Harris* at 22, 114 S.Ct. 367; *Andrews*, at 1486; *Cooper–Nicholas v. City of Chester*, 1997 WL 799443, at *3–4. An actionable working environment must be severe enough to affect the psychological stability of a minority employee, and such severity is not alleged here. *Andrews*, 895 F.2d at 1482.

We accept for purposes of deciding this motion that a reasonable fact-finder could potentially find that Ms. Cain suffered detrimental effects from Mr. Platt's behavior toward her. We will allow that Ms. Cain's claims, that she was in fear for her job and "lost a lot of sleep for being afraid," Cain Dep. at 120, could be sufficient to withstand a summary judgment motion.

However, as a matter of law, we find that a woman in Ms. Cain's position would not have suffered the detrimental effects associated with a hostile work environment. Mr. Platt, during the relevant time period, rarely spoke to Ms. Cain, and when he did, his questions, although allegedly personal, were not sexual in nature. *See* Cain Dep. at 51, 58. Nor did she ever hear him say anything about her, but rather only saw him whispering and surmised that she was the subject. Id. at 58. Indeed, she rarely saw him, and when she did it was merely in passing, as he left his shift and she arrived for hers. Id. at 58. Ms. Cain does not allege that the behavior interfered with her work performance, nor that she felt physically threatened or humiliated. *See Harris* at 23, 114 S.Ct. 367.

We therefore find as a matter of law that only "an overly sensitive plaintiff" and not a reasonable woman could have suffered a detrimental effect from the described behavior and the consequences therefrom. *See Harley* at 539.

### iii. Ms. Morris

■ During the four-month time period at issue, September 1996 through early January 1997, the harassment Ms Morris claims includes a few instances of staring and comments to other men that Ms. Morris could not hear. Morris Dep. at 68–69. As with the complaints of Ms. Bishop and Ms. Cain, we find the behavior complained of insufficient to support a claim of hostile work environment.

Again, the behavior was neither severe nor pervasive. Although Ms. Morris did not testify as to the exact frequency of the staring instances, she did explain that they "were much fewer" than they had been during the earlier, time-barred period, when they occurred approximately once a week or more. Id. at 19, 67. Such infrequency—"much fewer" than once a week—cannot be classified as regular, but is analogous to the casual, isolated incidents described in *Andrews*. 895 F.2d at 1482. Also, the behavior complained of is virtually equivalent o that complained of by Ms. Bishop and Ms. Cain, and by the same reasoning, *see supra* III.B.i,ii, we find that it was neither severe nor pervasive. *See also Faragher*, 118 S.Ct. at 2283 ("'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment'") (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)).

Additionally, the record before the court does not demonstrate the existence of a genuine issue of material fact as to the subjective requirement. "Title VII does not protect a plaintiff who experiences conduct that is merely offensive or annoying." *Maher v. Associated Servs. for the Blind*, 929 F.Supp. 809, 813 (E.D.Pa.1996). According to Ms. Morris, Mr. Platt's behavior toward her was so infrequent and mild that she didn't feel a complaint was necessitated. She makes no claims of any detrimental effect on herself stemming from the relevant time period. Therefore, there is no issue of fact for us to consider on the subjective element.

As we find no subjective detriment, so do we conclude that the objective detriment requirement is not satisfied. Ms. Morris's own lack of negative effect evidences that only an "overly sensitive plaintiff" would have been impacted with sufficient detriment. *Harley* at 539. Again very like Ms. Bishop and Ms. Cain, Ms. Morris's work and personal life appear not to be been interfered with at all during the relevant time period. *See Faragher*, 118 S.Ct. at 2283. The minor instances of staring and unheard comments would be sufficient to annoy a reasonable woman, but not to affect her psychological well-being.

### iv. Respondeat Superior

■ Defendant argues, and we agree, that even if a hostile work environment existed, Plaintiffs cannot establish respondeat superior liability. An employer can be liable for workplace harassment according to the principles of agency law. *Meritor*, 477 U.S. at 72, 106 S.Ct. 2399. Thus, employers are responsible for behavior of a co-employee where the plaintiff shows that there was no reasonable avenue for making a complaint, or that the employer knew or should have known of the harassment and failed to respond. *See Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708 (2d Cir.1996).[8] Plaintiffs in this case have failed to show either.

8. For cases involving a plaintiff's supervisor, "[a]n employer is subject to vicarious liability ... for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher* at 2293.

First, Amtrak had an adequate sexual harassment policy and complaint procedure in place during the entire time Plaintiffs worked there. Amtrak's equal employment policy was posted on bulletin boards by the time clocks that each Plaintiff used every day upon arriving for and departing from her shift. *See* Cain Dep. at 102. Amtrak distributes an EEO Internal Complaint Procedures Handbook, encouraging employees who feel they have been discriminated against to lodge a formal or informal complaint. *See* Davidson. Aff., Ex. A. The company sent an interoffice memo in July 1996, shortly after Martha Allen filed her complaint, reiterating Amtrak's sexual harassment policy and stressing the company's continuing intolerance for sexual harassment. Def.'s Br., Ex. 8. Amtrak distributes its Standards of Excellence booklet to all employees, Plaintiffs included. The Plaintiffs were aware or were given many opportunities to become aware of the policy and their right to lodge a complaint against any other Amtrak employee with either the union or management, yet they chose not to avail themselves of the protections Amtrak provided.[9] *See, e.g.,* Morris Dep. at 47–48.

Ms. Cain claims that the women who were harassed by Mr. Platt never told any supervisors "because they were afraid nothing would happen," and that women were intimidated because they were working in a "man's environment." Cain Dep. at 18. While we do not discredit the legitimate concerns of Ms. Cain about the real difficulties inherent in choosing to be a minority whistle-blower, we find that those fears would be typical to virtually all instances of whistle-blowing, and not particular to Amtrak's working environment. In fact, Ms. Cain testified in her deposition that in 1990, which period we have already found to be time-barred by the statute, she

was worried that if she complained she would lose her job, but that she doesn't "think of it that way now." Id. at 55.

We note that this case provides us a means of examining Amtrak's complaint procedure in action. When Martha Allen filed a complaint in 1996, a thorough investigation by top levels of management ensued. Later that year, another investigation was conducted when Jennifer DeCesare filed a grievance against Mr. Platt. As a result, Mr. Platt was terminated. Clearly, the procedure was sufficient for its purpose.

■■■■ The second type of respondeat superior liability for a non-supervisory employee occurs when an employer has notice, either actual or constructive, of the harassment. *Andrews,* 895 F.2d at 1486. Constructive notice includes information of which the employer should have been aware because of a supervisor's knowledge. *Id.* However, a supervisor's knowledge generally will be imputed to the company for purposes of liability only if the supervisor is at a sufficiently high level in the company hierarchy. *Id.* Therefore, an employer will be liable for sexual harassment if the plaintiff proves that management-level employees had knowledge about a hostile work environment and failed to take prompt and adequate remedial action. *Knabe v. Boury Corp.,* 114 F.3d 407 (3d Cir.1997). This includes an employer who was negligent or reckless in failing to train, discipline, fire or take remedial action upon notice of harassment. *Bouton v. BMW of North America, Inc.,* 29 F.3d 103, 106 (3d Cir.1994). Also, corrective steps are only effective if they timely stop the harassment or are reasonably calculated to prevent further harassment. *Knabe v. Boury Corp.,* 114 F.3d 407, 411 n. 8 (3d Cir.1997).[10]

**9.** Ms. Cain, in fact, admits that she chose not to consult the posted policy with regard to Mr. Platt. Cain Dep. at 102–103. After she transferred from the Indiana facility back to the Delaware facility, she simply "did not feel any need to consult that posting," despite the

alleged stares and whispered comments. Id. at 102–104.

**10.** Under *Faragher,* an employer may raise an affirmative defense for the harassment of an employee by her supervisor in the absence of

■ Here, we find no genuine dispute of material fact as to whether Defendant's preventive and remedial efforts were adequate. Defendant had no notice of the behavior now complained of until the time when it began its investigation of Ms. Allen's complaint. It then thoroughly investigated Plaintiffs' claims and took appropriate remedial action. Although Ms. Davidson ultimately determined that Plaintiffs' claims were time-barred, as they stemmed from instances occurring more than three years prior, Mr. Platt was counseled and warned.[11]

While remedial actions insulate Amtrak from Title VII liability only if they were "reasonably calculated to prevent further harassment," we find that the action taken by Ms. Davidson during the two relevant investigations satisfy this test. *Knabe v. Boury Corp.*, 114 F.3d 407, 412 (3d Cir. 1997) (citations omitted). As soon as Defendant became or could have become aware of Mr. Platt's offending conduct, it exercised care in preventing that conduct, instigating a comprehensive investigation, and ultimately terminating Mr. Platt when it determined that termination was warranted by the charges against him.[12]

Moreover, none of the Plaintiffs complained about Mr. Platt to any management-level personnel until the time of the investigation. Ms. Morris and Ms. Cain spoke with Roosevelt Gill, the general foreman and therefore high-level supervisor for notice purposes, when Mr. Platt transferred to Bear in September 1996, after the Martha Allen investigation.

Morris Dep. at 59. Each other time that a Plaintiff complained to somebody, though, either it was to a low-level employee or the Plaintiff specifically requested that nobody else be told. Additionally, most of those complaints occurred during the time-barred period. None of the Plaintiffs in this case followed the clear instructions provided by Amtrak to complain of discrimination, and thus did not satisfy their "duty to use such means as are reasonable under the circumstances to avoid the damages stemming from sexual harassment". *Faragher*, 118 S.Ct. at 2292 (*citing Ford Motor Co. v. EEOC*, 458 U.S. 219, 231, n. 5, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982)).

■ Finally, there can be constructive notice also where the harassment is so pervasive and open that a reasonable employer would have had to be aware of it. *see, e.g., Zimmerman v. Cook County Sheriff's Dep't*, 96 F.3d 1017, 1018–19 (7th Cir.1996). In the instant case, given the short time over which the harassment occurred, the limited instances of interaction, and the fleeting nature of the interactions, Amtrak management had little opportunity to discover the harassment absent Plaintiffs giving the company actual notice. *See Hall v. Gus Constr. Co.*, 842 F.2d 1010, 1016, 1018 (8th Cir.1988) (even if supervisor was not aware of all the abuse, "unrelenting pattern of verbal, physical and psychic abuse" involved incidents "so numerous" that employer was "liable for failing to discover what was going on and to take remedial steps to put an end to it"). Moreover, the harassment in this

a tangible employment action. The defense requires "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Id. at 2293; *see also Burlington Industries v. Ellerth*, 118 S.Ct. at 2270.

11. We note, for example, that Ms. Bishop told Ms. Davidson that Mr. Platt stopped bothering her when Ms. Bishop's brother spoke with him, which was sometime before 1993.

Davidson Aff. at ¶ 12; *see also* Bishop Dep. at 117. That time period was barred not only by Amtrak's internal policy, but, as we have found, by the statute of limitations for discrimination cases.

12. We note that Defendant's action in terminating Mr. Platt was considered overly harsh toward Mr. Platt, as Defendant was ordered to rehire him with back pay. This suggests that Defendant sought to protect the formal complainant, as well as the other women, further than allowed under law.

case was not of the kind that would have been easily discoverable by management. *See Lipsett v. University of Puerto Rico,* 864 F.2d 881, 888, 906 n. 25 (1st Cir.1988) (notice was possible where male surgical residents had posted Playboy centerfolds in location where all residents ate their meals).

## V. CONCLUSION

For all of the above reasons, Defendant's Motion for Summary Judgment is GRANTED with respect to all claims and against all Plaintiffs.